[Civ. No. 17654. Second Dist., Div. Two. May 14, 1951.]

TERESITA G. BROOME, Appellant, v. MONTAGUE W. BROOME, Respondent.

Heaney, Price, Postel & Parma for Appellant.

Clarence C. Ward and J. Vincent Wood for Respondent.

MOORE, P. J.—Demurrer having been sustained to the fourth amended complaint, judgment that plaintiff take nothing was duly entered. On this appeal plaintiff demands a reversal on eight specified grounds which will appear as the story unfolds.

### The Fourth Amended Complaint

The substance of the voluminous pleading is as follows: October 2, 1934, the parties executed an agreement settling their property rights and on the same day plaintiff instituted her action for divorce. The cause having come on regularly for trial on the following December 19th, an interlocutory decree was granted and the court confirmed the property settlement agreement by whose terms defendant conveyed and transferred to plaintiff five ($1,000 par value) City Service Bonds and one half of all other securities[1] then owned by him, and agreed to execute the documents necessary for a valid transfer. About the same time defendant transferred the City Service Bonds and made an equal division of his securities "enumerated in a list attached as 'Exhibit A' to said agreement, and did make physical transfer and delivery to plaintiff of her one-half share thereof." In addition to the five bonds and securities, defendant at the time of agreement was the owner of 480 shares of Chesapeake and Ohio Railway Company common stock, par value $25, which owner-

---

[1]The word "securities" as used includes bonds, stocks and choses in action.

ship arose under and by reason of the following unusual circumstances: Frances Broome, mother of defendant, died testate November 8, 1921, leaving her net estate in equal shares to her three surviving children, Amy Haswell, Thornhill Broome and defendant. Her will was admitted to probate June 27, 1922, and letters of administration were issued to defendant as sole administrator. A decree of settlement of the first and final account and of final distribution was made by the court on October 18, 1923. By such decree all the assets of the estate then known and any other property not known or discovered but owned by decedent at her death were distributed in equal undivided interests to the three surviving children.

Seventeen years after defendant had been discharged as such administrator with will annexed, to wit, in the month of August, 1940, Thornhill Broome, then residing in Chicago, Illinois, desirous of ascertaining certain genealogical data relating to his family requested his sister, Amy, at San Francisco to reexamine any family records, diaries and albums left by his mother. Pursuant to her brother's request and while searching through such records, she discovered between the pages of an album a trust receipt dated February 15, 1899, and drawn to the order of Frances Broome upon J. P. Morgan and Company. The receipt evidenced ownership of the 400 shares of common stock of the Columbus, Hocking Valley and Toledo Railroad Company. Upon inquiry of Morgan and Company as to the possible current value, it was learned that by reason of certain reorganizations during the preceding 41 years in such railroad company and its immediate successor, Hocking Valley Railway Company, and its ultimate successor, the Chesapeake and Ohio Railway Company, the trust receipt was on the date of its discovery in August, 1940, redeemable in 1,440 shares of Chesapeake and Ohio Railway Company par $25 common stock whose market value at that time was approximately $40 per share. In addition, dividends had been declared upon the 1,440 shares, upon its various predecessor shares of the Chesapeake and Ohio Railway Company and upon the shares of other predecessor companies from which the 1,440 shares had ultimately derived; that such dividends so successively declared and paid between 1901 and August, 1940, had been regularly collected and accumulated by Morgan and Company and credited to the account of Frances Broome. The dividends so collected and held for Mrs. Broome as of August 3, 1940, amounted to $75,299.40. In addition there

were 28.80 shares of Series A, 4 per cent stock of the Chesapeake and Ohio Railway Company received as a dividend in 1937 whose market value in 1940 was $95 per share.

Prior to the discovery of the trust receipt, its existence and the additional assets of the estate of Frances Broome had not been suspected by any one of the three children—although one-third interest therein had passed to each of them upon the death of their mother under her will and had been confirmed to them under the decree of final distribution. Thereafter, defendant's attorney in the administration of the estate of Frances Broome, pursuant to the terms of the final decree of distribution, in December, 1940, caused one third of said "after-discovered" property to be delivered to defendant. It consisted of 480 shares of Chesapeake and Ohio Railway stock, 9.60 shares of Chesapeake and Ohio Railway Company Series "A" 4 per cent preferred stock and cash in the sum of $25,728.13.

After her divorce from defendant, plaintiff had little communication with him. In 1936 he married a person other than plaintiff, after which defendant has never met with or in any way communicated with plaintiff except through their attorneys in the present action after January 16, 1947.

Defendant did not inform plaintiff of the discovery of additional assets or of the distribution of one third thereof to him, but concealed such fact from plaintiff until his deposition was taken June 10, 1948. Although she occasionally saw and communicated with defendant's brother and sister after her divorce from defendant, neither of them ever informed her of the discovery of the additional assets except the occasion on which plaintiff met with Mrs. Haswell in San Francisco about November, 1946. In the course of conversation, information concerning the division of jewelry of defendant's mother among her three children was volunteered by Mrs. Haswell. Also, she informed plaintiff that in the box where the jewelry had been stored for many years were a number of certificates representing the securities determined to be worthless. She told also of the discovery made by her in 1940 of the certificate evidencing the rights of the Broome heirs to certain railway stock and the subsequent distribution thereof to the three children. Prior thereto, no one had disclosed to plaintiff any knowledge concerning the discovery or distribution of the additional assets, and until the conversation with Mrs. Haswell, plaintiff had been ignorant of the discovery.

Upon reporting such facts to her counsel, the latter searched the records of the probate proceedings of the city and county of San Francisco and found proof in the amended inheritance tax returns of the distribution of the additional assets.

On January 16, 1947, plaintiff made demand upon defendant to divide and transfer to her one half of the "after-discovered" property distributed to him together with one-half share of the dividends paid after distribution, which demand was refused. Plaintiff has fully performed all her obligations under the property settlement agreement while defendant has failed to perform his.

Except as herein above alleged, nothing ever came to plaintiff's attention to provoke her inquiry as to the discovery and distribution and nothing occurred which might have occasioned her inquiry. She could not have discovered the facts of the discovery and distribution sooner.

With intent to deprive plaintiff of her share of the after-discovered property, defendant fraudulently concealed from her all information concerning its discovery and distribution. As a result plaintiff was unaware of such facts and of her right to demand her share until the time of her conversation with Mrs. Haswell about November, 1946, and the investigation made by her attorneys. Defendant still detains the one-half share of the after-discovered property distributed to him in 1940 with all its profits and gains in violation of plaintiff's rights.

No Substantial Change From Third Amended Complaint

Substantially the same facts are alleged for a second cause of action. While the allegations of the fourth amended complaint disclose practically no new fact that was not included in the third amended complaint and for that reason it might appropriately be stricken, yet a consideration of the merits of the demurrer is deemed a more satisfactory disposition of the controversy.

### The Demurrer

The grounds of demurrer are (1) the complaint does not state facts sufficient; (2) the action was not commenced within the period prescribed by the Code of Civil Procedure, section 337, subdivision 1; section 338, subdivision 4, and section 343. A consideration of the sufficiency of the facts alleged and of the proposed plea of res judicata will show

the soundness of the judgment. Plaintiff's theory is summarized in the marginal note.[2]

### THE INTRODUCTORY JUDGMENT IS RES JUDICATA

The incorporation of the agreement of property settlement in the judgment for divorce merged it in the decree. Thereupon, the agreement was superseded by the decree and the obligations imposed by the agreement are imposed by the decree and the "value attaching to the separation agreement is only historical." (*Hough* v. *Hough*, 26 Cal.2d 605, 609 [160 P.2d 15].) A divorce decree which establishes the property rights of the parties is not subject to modification without the consent of both parties. (*Puckett* v. *Puckett*, 21 Cal.2d 833, 840 [136 P.2d 1].) If it appears to have been the intention of the parties to a property settlement agreement definitely and permanently to adjust their property rights, the court cannot thereafter modify the decree. (*Hamilton* v. *Hamilton*, 94 Cal.App.2d 293, 299 [210 P.2d 750].) When an interlocutory judgment for divorce, valid on its face and regularly entered is not vacated, it be-

[2]In her thoughtfully considered brief appellant presents her theory of her right to recover, to wit: By the property settlement respondent effected a present transfer to her of one half of "all bonds, stocks, choses in action and securities then owned by him, a list of which is set forth in Exhibit 'A' attached to the agreement"; he paid her $2,015 and delivered her five $1,000 bonds of Cities Service. Besides the above mentioned property respondent owned on the date of the agreement, to wit, October 2, 1934, an undivided one-third interest in and to all other undistributed property of the estate of his mother who had deceased 13 years before and by virtue of the agreement appellant became owner of one half of such portion as belonged to respondent under the decree of distribution of such estate even though such undistributed share was not discovered until 1940. Because he retained the entire share of the newly discovered assets, respondent became an involuntary trustee of one-half thereof for appellant; because he concealed from appellant all knowledge of the discovery of such assets with the intention of preventing her from enforcing her right to one half thereof, such concealment tolled the statutes of limitation until appellant learned of the distribution thereof. Immediately upon learning of the discovery and distribution, about November, 1946, appellant made an investigation and on April 14, 1947, filed her complaint. Appellant asserts that her right of recovery is not impaired by the merger of the agreement in the interlocutory decree of divorce if a merger occurred; that if it was not, her claim of ownership to one half of the "after-discovered securities" rests in the division and assignments effected by the agreement and if it was merged for all purposes, her claim of ownership in such securities rests in the terms of the interlocutory decree. She maintains that under the agreement she became the owner of the newly discovered property and respondent holds it as her trustee. In either event, appellant maintains that the task of the reviewing court is to interpret either the agreement or the decree and that a sound interpretation of either will lead to no conclusion contrary to her contention.

comes a final judicial determination of the property rights of the parties and of all other matters not suspended until the entry of the final decree. (*Deyl* v. *Deyl*, 88 Cal.App.2d 536, 539 [199 P.2d 424].) ■ Inasmuch as the interlocutory decree stands unimpeached it must of necessity be res judicata of the instant claims of appellant. She is attempting now to relitigate an adjustment of her property rights which were fixed by the interlocutory judgment. She attempts to escape the effect of that decree by contending that she is entitled under the terms of "the agreement" to one half of the "after-discovered property" and its income. She thus makes a collateral attack on the decree without alleging any facts that might have defeated a full and fair trial of the divorce action. This cannot be done. No second action can be tried as to anything within the scope of the first whether in fact it was alleged and considered in the first or not, so long as the same matter was actually in issue. (*Titensor* v. *Titensor*, 75 Cal.App.2d 206, 209 [170 P.2d 479].)

AFTER-DISCOVERED SECURITIES NOT INCLUDED IN AGREEMENT

■ Whether or not appellant's right to a half of the after-discovered securities was adjudicated by the divorce decree, she cannot recover by this action. From a reading of the agreement in its entirety which is essential to a fair and reasonable interpretation of an instrument (*Lazar* v. *Superior Court*, 16 Cal.2d 617, 622 [107 P.2d 249]), the conclusion is inescapable that respondent made a definite and definitive contract with appellant. The parties had no community property. Appellant had to be satisfied with a share of respondent's possessions. He gave her one half of the securities which were described in an exhibit attached to the agreement. The deletion from the exhibit of a certain stock[3] prior to the execution of the agreement emphasizes that the parties attempted to designate with exactness the securities to be divided.

■ Appellant makes capital of the fact that while paragraph FIRST (c) provides for the immediate division of the property, it does not require prompt delivery, and therefore the parties had in mind that the division might operate on assets not then known to either of them. The language referred to by appellant is as follows: "the division of one-

---

[3]Russ Building Company, $10,000, 6 per cent first mortgage, gold bonds, series A, due January 1, 1938, was stricken from the list on the face thereof.

half (½) to be made by dividing equally each of the bonds, stocks and securities and said first party agrees to take the necessary steps and execute the requisite instruments to effect such division thereof immediately, and to effect the delivery to said second party, of second party's portion thereof, and from and including October 1, 1934, the dividends, interest and income thereon shall belong to second party.'' From such excerpt it is clearly apparent that respondent cautiously provided for delivery at once to appellant of her portion of the securities, leaving no room for argument as to her right to the profits and dividends earned after the date of the agreement.

Appellant appears to contend by the last quoted passage from the agreement that the parties intended it as an omnibus clause such as is oftentimes used in decrees and in contracts to dispose of subsequently-discovered property. Such is not a reasonable deduction. Where two lawyers officiate in the preparation of a contract finally to adjust property rights, if they entertain a thought that other property exists or will be discovered, they will beyond a peradventure make a definite provision for its disposition upon its coming into the possession of either. If the court is to be guided by a writing upon which an action is founded it must be construed rationally and not for the purpose of helping a disappointed or deserving person. So construing the agreement here involved, it is clear that the quoted passage conveys no thought other than that appellant was to get one half of respondent's securities and money listed in the exhibit. He knew of no other property that might be his own. He listed what he agreed to divide. If by chance his sister had found a deed conveying to his mother the East Texas oil field, could it be maintained that by the language of the quoted portion of paragraph FIRST appellant is entitled to one sixth thereof? Such a contention would be stultiloquent not because of the immense value of the supposititious devise but because the definitive list of securities to be shared with appellant conclusively demonstrates the mutual intention of both parties when they effected a property settlement agreement. That instrument does not make a division of all respondent's property. Neither does it expressly transfer to appellant one half of all securities of respondent. As observed by the trial judge, ''to limit the scope of this language does violence to every rule of interpretation of contracts. (Civ. Code, §§ 1635-1661.) The after-discovered property was not excluded by reference to Ex-

hibit 'A' but was included in the term 'all'; the obvious and clear intent being to make equal division of all securities (except said City Service bonds) and to make specific division of all other property.'' That they made such division is shown by the quoted subparagraph (c) which provided for respondent to make the division of the securities ''by dividing equally each of the . . . securities . . . immediately, and to effect the delivery'' to appellant of her portion thereof.

That the agreement was intended to be definitive is further illustrated by the language of the fourth and fifth preambles, to wit:

''WHEREAS, the said first party has represented to said second party that the property hereinafter mentioned and referred to constitutes all of his property, real, personal and mixed, of whatsoever kind or character, wheresoever situated, which he owns and in which he has any interest, and that said property represents substantially and as far as first party can now ascertain, all of his assets; and

''WHEREAS, first party has agreed, and does hereby agree, to divide all of such property in accordance with the provisions hereinafter stated . . .''

A reading of the quoted preambles along with the contract in its entirety is impressive of the contractual intent that the exhibit attached to the agreement should be considered as the total of all securities to be divided and that no others were in contemplation. ■ That the entire document and all its parts should be read together is the orthodox method of interpretation for deriving the truth. (Civ. Code, § 1641; *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 760 [128 P.2d 665]; *Ghirardelli* v. *Peninsula Properties Co.*, 16 Cal.2d 494, 496 [107 P.2d 41]; *Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108, 114 [291 P. 184].) Place the judge in the position of the authors of a contract and he should then with knowledge of the circumstance of its execution of the subject of the writing, be able to divine their intentions. (Civ. Code, §§ 1647, 1648, 1650; Code Civ. Proc. § 1860.) ■ The purpose of a writing must be ascertained solely from a common-sense meaning of it as a whole with a view to effectuate the mutual intention of the parties. (*Miranda* v. *Miranda*, 81 Cal.App.2d 61, 66 [183 P.2d 61].) ■ A contract must, if possible, be given a reasonable rather than an unreasonable construction. (*Oberwise* v. *Poulos*, 124 Cal.App. 247, 251 [12 P.2d 156].)

■ In effecting a property settlement with her husband

by taking one half of all his known listed possessions could any reasonably disposed woman be so bold as to assert: "I am taking this in settlement with my husband, but if manna should in the future fall from heaven upon him by virtue of his being the son of his mother, I shall demand one half of it as one of the securities divided by this agreement"? Would any man of normal instincts endued with common honesty and intelligence in settling upon his wife one half of all his known and described property entertain the thought: "although I now assign and pay to my wife one-half of my known wealth consisting of many thousands of dollars, if perchance it should turn out that my mother who deceased 15 years ago owned other forgotten securities, I shall share it with my wife who is about to divorce me"? A fair construction of the agreement leads to no conclusion other than that it was intended to be definitive. That both parties and their lawyers must have so regarded it is further evidenced by the included covenant that the agreement shall operate as a "conclusive stipulation." It follows, therefore, that appellant at no time acquired an interest in the "after-discovered property."

In aid of her contention that the agreement included the railroad stocks and their dividends that came to light 17 years after mother Broome deceased appellant cites a number of respected authorities that do not support her. In *Johnson* v. *Grand Fraternity*, 255 F. 929 [167 C.C.A. 221], the defendant had agreed to pay the plaintiff specified commissions upon "all business" written under the designated types of policies, referring to attached exhibits. The court said that the only function of the exhibits was "to prevent any future dispute as to any particular policy" and held that where reference is made to another writing for a particular specified purpose such writing becomes a part of the contract, citing *Moreing* v. *Weber*, 3 Cal.App. 14, 20 [84 P. 220]. In *Chicago Union Traction Co.* v. *O'Connell*, 224 Ill. 428 [79 N.E. 622, 8 L.R.A.N.S. 1034], a release was given the company of "all claims, demands, actions, causes of actions . . . from the beginning of the world to . . . date hereof and especially on account of a certain accident which occurred on or about the 18th day of July, 1903." The court held that such release dated about a month after the specified accident barred an action for an accident which occurred in March, 1902, because the more general intent is first stated. Also, it held that where there is a particular recital and general

words follow, the latter are qualified by the particular recital. Similarly, all the cases cited by appellant support respondent's interpretation of the agreement involved, or are distinguished on their facts.

The courts of this state have uniformly adhered to the doctrine that for a correct interpretation a contract must be regarded as a whole; each clause must be given the limitation or qualification evidently intended by the authors. This is done by a consideration of the writing in its entirety and, if necessary, of the circumstances of the parties at the time of the contract. (*Lemm* v. *Stillwater Land & Cattle Co.*, 217 Cal. 474, 480 [19 P.2d 785]; *Ogburn* v. *Travelers Ins. Co.*, 207 Cal. 50, 53 [276 P. 1004].)

Judgment affirmed.

McComb, J., and Wilson, J., concurred.

The opinion was modified to read as above printed and a petition for a rehearing was denied May 29, 1951. Appellant's petition for a hearing by the Supreme Court was denied July 12, 1951. Shenk, J., voted for a hearing.