**PRECISION DYNAMICS CORPORA-TION, a California corporation, et al., Plaintiffs,**

v.

**AMERICAN HOSPITAL SUPPLY COR-PORATION, a corporation, et al., Defendants.**

Civ. A. Nos. 519–59, 342–60.

United States District Court
S. D. California,
Central Division.

March 31, 1965.

Thomas P. Mahoney, Los Angeles, Cal., for plaintiffs.

Frederick W. Lyon, Glendale, Cal., Leigh R. Gignilliat, III, of Hough, Young & Coale, Chicago, Ill., A. Calder Mackay, of Mackay, McGregor & Bennion, Los Angeles, Cal., and Harris K. Lyle, of Lyle, Yudelson & Di Giuseppe, Van Nuys, Cal., for defendants.

STEPHENS, District Judge.

This cause having come on regularly for trial during which witnesses were heard and exhibits were filed and considered, the Court having rendered its decision and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law pursuant to the provisions of Rule 52 of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

### I. JURISDICTION

1. Plaintiff, Precision Dynamics Corporation ("Precision"), is a California corporation having its principal place of business in the City of Burbank, County of Los Angeles, State of California, in this judicial district.

2. Plaintiffs, Walter W. Mosher, Jr., Donald A. Long, Stanley E. Charles, Joseph E. Long, Harold W. Neilly and Arthur Knutson are citizens of the State of California and reside within this judicial district.

3. Defendant, American Hospital Supply Corporation ("American"), is an Illinois corporation having its principal place of business in Evanston, Illinois, and a regular and established place of business in the City of Burbank, California, within this judicial district.

4. Defendants, Tested Advertising Techniques, Inc. ("TAT"), Forest LeJon, Inc. ("LeJon") and Forester & Roth, Inc. ("F&R"), are all California corporations having their principal places of business within the State of California and within this judicial district.

5. Defendants, Leonard Roth and Gene Forester are citizens of the State of California and reside within this judicial district.

6. This is a consolidated action. Case No. 342–60–S was and is consolidated with case No. 519–59–S for all purposes. There are four counts:

a. For violation of the antitrust laws of the United States;

b. For breach of contract;

c. For patent infringement; and

d. For patent mismarking.

7. The cause of action for violation of the antitrust laws of the United States arises under Sections 1, 2 and 14 of Title 15 of the U. S. Code. Jurisdiction of the Court is predicated upon Section 1337 of Title 28 of the U. S. Code.

8. The only defendant under the cause of action for breach of contract is defendant American. Jurisdiction of the Court over this count is predicated on Section 1332 of Title 28 of the U. S. Code, diversity of citizenship between the parties plaintiff and defendant American. The matter here in controversy exceeds the sum of Ten Thousand Dollars ($10,000).

9. Jurisdiction of the Court over the patent infringement and patent false marking counts is predicated upon Section 1338 of Title 28 of the U. S. Code.

## H.  ANTITRUST CAUSE OF ACTION

10.  Plaintiffs have charged that the defendants entered into an alleged unlawful exclusive agreement and otherwise violated the antitrust laws of the United States in the introduction and sale of the Safeguard bracelet.  Defendants have denied all such charges.

11.  Defendant American is engaged in the business of selling and distributing hospital supplies to hospitals and other medical organizations and has offices throughout the United States, including one in Burbank, California.  Most of the items distributed by defendant American are purchased from independent companies.

12.  In 1956, plaintiff Donald A. Long, and one Arthur R. Goldammer were employed by defendant American in the Inventory Department of its Burbank Office.  Goldammer, together with plaintiff Walter Mosher, designed a bracelet to be used for the purposes of identifying patients in hospitals, and in the month of July, 1956, caused the plaintiff, Precision Dynamics Corporation, to be formed for the purpose of manufacturing and selling these identification bracelets.

13.  American began the promotion and sale of plaintiff Precision's identification band in April, 1957, under American's trademark, "Chieftain."

14.  Prior to the sale of the Precision bracelet, American had sold baby beads, Presco and Wallick identification bands, but all of these methods of identification were more expensive than plaintiff Precision's identification bracelet which was purchased by American at a price of $11.66 for a box of 144 bands, or at a price of 8.1 cents per band.  In turn, American sold these bracelets to hospitals and other purchasers at prices ranging from 13.4 cents to 18.9 cents per band, depending upon the style and quantity ordered.

15.  There are a number of companies selling identification bracelets.  In 1957, Hollister, Inc., an independent manufacturer, was selling its bracelets under the name, "IDENT-A-BAND," through its own salesmen to hospitals at prices ranging from 7⅔ cents to 14¼ cents per band depending upon the quantity and style purchased.

16.  On January 17, 1958, an agreement was executed between Precision and American covering the sale by American of the identification band manufactured by Precision.  The agreement recites that Precision was the exclusive licensee under the patent application of the inventors for the manufacture and sale of this identification band and provided basically as follows:

(a) American was given the right to sell and distribute the identification bracelet under its trademark, "Chieftain," exclusively throughout the world.

(b) The price to American for such bracelet was established at $11.66 per box of 144 f. o. b. factory, packaged and ready for shipment, on terms of net 30 days.

(c) Paragraph 4 of said agreement provides as follows:

"4.  AMERICAN will advertise said BRACELETS in its Monthly Bulletin and in such other media as it may choose at such times as it deems it desirable. AMERICAN will use its reasonably best efforts to promote and stimulate the sale and distribution of said BRACELETS in the hospital and medical field as specified.

"AMERICAN shall have the right to determine all other policies in connection with the promotion, sale and distribution of said BRACELETS, including, but not limited to, the promotion method and media, the sales policies therefor, advertising, selling price, and other terms of sale, and any other matter relating to the promotion, sale and distribution thereof."

(d) Precision agreed to prosecute and obtain at its own cost letters patent from the United States patent office on the bracelet and American agreed to pay all costs involved in obtaining any foreign patents on the bracelet.

(e) The agreement was for an initial term of two years commencing

April 15, 1957, with the provision that it would be extended on a year to year basis thereafter so long as the purchases of bracelets by American in the second and succeeding years equalled or exceeded certain minimum annual purchase quotas computed under the contract. For the second year of the contract the "basic minimum annual purchase quota" was fixed at 75% of the bracelets purchased by American in the period between April 15, 1957, and April 14, 1958.

(f) The agreement further provided that even if American failed to meet its minimum annual purchase quota, the agreement would not be terminated unless Precision gave 30 days' notice to such effect within 30 days after the close of the performance year, and that failure to do so constituted a waiver of such failure.

(g) Paragraph 7 of the agreement stated:

"It is mutually and specifically understood by and between the parties hereto that said minimum annual purchase quota shall constitute and be construed only as a minimum standard of performance which AMERICAN must meet if the MANUFACTURER is not to have the right to terminate this Agreement, and it shall in no way constitute nor be construed as an Agreement by AMERICAN to purchase any minimum amount of said BRACELETS hereunder."

(h) Paragraph 9 of the agreement provides as follows:

"9. In the event that this Agreement shall for any reason be terminated, * * *

"However, any such termination hereof shall not terminate or discharge any right hereunder of a continuing nature nor shall it terminate or discharge any right of either party hereto against the other accrued or fixed hereunder at the time of termination."

17. April 14, 1958, was the close of the first performance year under Paragraph 7 of the agreement. During the first year American purchased approximately 6,488 boxes of the "Chieftain" bracelet, so that under the agreement 75% of this total or 4,866 boxes became the minimum standard performance for the second contract year ending April 14, 1959.

18. In the summer of 1958, American undertook the sale of a new identification band known as the "Ameri-band" manufactured by the Mark-Clark Co.

19. The defendant Tested Advertising Techniques, Inc., sold various types of hospital supplies, including diet cards, to American. Defendant Roth was the President of TAT and was personally acquainted with a number of the officers and personnel of American.

20. In the summer of 1958, Roth advised American that he had been developing for some time an identification bracelet which he planned to sell under the name "Safeguard."

21. Also in the summer of 1958 Precision commenced to market a different kind of identification bracelet under its trade name "Securline."

22. In August, 1958, plaintiff Mosher, who was then President of Precision, sent American a copy of the promotional material on the new "Securline." In his letter he asked Mr. Harlan F. Borin, Vice President of American, if he knew anything about defendant Roth's intention to market and sell an identification bracelet. On September 5, 1958, Borin wrote plaintiff Mosher stating, "Len Roth has talked to us about a bracelet he contemplates making. We have not seen the finished product. Naturally, if we like the bracelet, we would be interested."

23. In the fall of 1958, Mosher suggested that Precision would furnish samples of the "Chieftain" for a new promotion. On October 2, 1958, Warren Holl of American advised Mosher that American's promotional activities on the "Chieftain" had been planned for the balance of the year and that due to the unsettled conditions in the bracelet market, it was too early to plan any promotion for 1959.

24. In November of 1958, Roth advised American that he was ready to market his identification bracelet which would be manufactured to sell to hospitals at approximately 5 cents each. As early as December, 1958, American had introduced the "Safeguard" at a meeting of its salesmen.

25. Throughout the period from January 17, 1958, through the end of the year 1958, American promoted the plaintiff's "Chieftain" bracelet in its monthly bulletin to hospitals and in its weekly periodical to its salesmen, known as "The Gossip".

26. In December of 1958, negotiations took place between Roth and American for the sale by American of Roth's bracelet, the "Safeguard". These negotiations concluded in an oral agreement in January or early February, 1959, by which American would be the exclusive distributor for the "Safeguard" bracelet until such time as the production of this bracelet exceeded American's demand.

26A. It was agreed between Roth and American that American would reduce the number of brands of identification bracelets which it would actively promote and carry in its catalog. It was not agreed between Roth and American that American would eliminate the "Chieftain" identification band from its catalog and cease its distribution and sale.

27. After the agreement between American and Roth for the distribution of the "Safeguard" bracelet, Frederick Grossman and other employees of American talked about discontinuing the "Chieftain" on June 1, 1959, but decided to postpone such discontinuance until promotion of the "Safeguard" arrived at the point where the loss occasioned by ceasing to promote the "Chieftain" could be picked up by the "Safeguard".

27A. The term, "discontinuance", as used by American and in Findings 27 and 31, means that the product referred to would no longer be included in American's catalog or other advertising and would no longer be stocked or promoted by American, but it does not mean that the product would no longer be sold by American's salesmen to any customer desiring to purchase the product.

28. In January and February of 1959, correspondence was exchanged between American and Precision with respect to the promotion of the "Chieftain" to be carried on during the period of March 15 through May 15 of that year. By letter dated January 26, 1959, American requested Precision to send its proposed cooperative advertising agreement and represented that American would consider it. By letter dated January 30, 1959, American advised Precision that the "Chieftain" was scheduled for another advertising promotion and represented that there was no need to be concerned about competition. By letter dated March 4, 1959, American advised Precision that it was not in favor of reducing the profit margin and that American was satisfied with the February 12 price schedule.

29. In March, 1959, a full page promotion of the "Chieftain" tri-band kit was published in American's monthly bulletin and circulated to its customers.

30. By letter dated March 19, 1959, Warren F. Holl, Merchandising Manager for American, advised Mosher that American had delayed replying to Precision's proposed cooperative advertising program of February 18, 1959, because only the week before did American make a decision concerning it and that they would rather not sign the proposed agreement because American did not know what the market held for it.

31. On March 27, 1959, a confidential memorandum was circulated by American to its Regional Managers advising them of the advent of the "Safeguard" bracelet, that the sales of the Presco, Securline, and Ameri-bands were to be discontinued and that the sale of the "Chieftain" bracelet would be maintained until such time as all customers were converted to the "Safeguard". The memorandum also stated, "The (Safeguard) bracelet is priced lower than any of the bracelets in our line, and we will have an exclusive. As part of our exclusive

we have agreed to discontinue, in an orderly fashion, sales of any other bracelet lines."

32. On or about April 1, 1959, defendants Forester and Roth caused defendant Forest LeJon, Inc. to be incorporated to serve as the sales organization company for the "Safeguard" bracelet.

33. April 14, 1959, was the end of the second contract year under the agreement between American and Precision. In this year, pursuant to the provisions of such agreement, American was required to purchase 4,866 boxes of "Chieftain" bracelets. In this period, American actually purchased 7,898 boxes.

34. The "Safeguard" bracelet was shown for sale by American on April 15, 1959, by an article in American's periodical to its salesmen, known as "The Gossip".

35. Prior to the introduction of the "Safeguard" bracelet, American did not advise the personnel of the plaintiff Precision of the decision to sell the "Safeguard" bracelet.

36. The "Safeguard" identification band was packaged in boxes of 250 bands. The price to the hospital ranged from 4¾ cents to 6½ cents depending upon the style and quantity of bands purchased.

37. The defendant LeJon sold the "Safeguard" band to American at a price of 3¼ cents each, or approximately 5 cents less than the price at which American could purchase the "Chieftain" band from Precision.

38. The commission rate established by American for the sale of the "Safeguard" bands was higher than the commission rate established on the sale of the "Chieftain" and "Securline" bands manufactured by Precision, although the dollars received by the salesmen as commission on the corresponding number of the "Chieftain" bracelets would be higher than the dollar amount received on the corresponding number of sales of the "Safeguard" bracelet.

39. As a part of the introduction of the "Safeguard" bracelet, defendant Roth through his companies, defendants TAT and LeJon, undertook at their expense a promotion whereby each one of the American salesmen who sold more than a designated quantity of the "Safeguard" bracelets would receive an oil color portrait. In addition, defendant LeJon as a part of the introduction of the "Safeguard" bracelet agreed to supply purchasers with an additional ten percent of their initial orders as free goods.

40. On or about May 1, 1959, Precision reduced the cost of the "Securline" identification bracelets from $10.08 per box to $5.76 per box to American. On May 1, 1959, Precision informed American that it had cut the "Securline" price. On or about July, 1959, Precision cut the "Chieftain" price and forwarded a copy of the recommended selling price of "Chieftain" and "Securline" to American.

41. Shortly after the notification of American by Precision that the "Securline" bracelet prices to American were changed, American reduced its sales price of "Securline" bracelets, proportionally, to the reduction in cost by Precision. Not until on or about October 17, 1960, did American proportionately reduce its sales price on the "Chieftain".

42. The first sales of the "Safeguard" band were completed in June, 1959, and in this month American purchased 1,728 boxes of this bracelet.

43. On or about June 24, 1959, Precision announced the introduction of the Precision bracelet which was and is the same as the "Chieftain" bracelet. It was sold to the trade at 4 cents per bracelet with a suggested retail price of 5 cents per bracelet.

44. American has continued to sell the "Safeguard", "Chieftain" and "Securline" bracelets up until the time of trial.

45. The relevant competitive market applicable to the case at bar is not the hospital supply market, but only a part thereof, to wit, the hospital patient identification bracelet market.

46. Plaintiffs have not produced evidence from which the Court can define with any reasonable accuracy the said relative competitive market or the share of said market controlled or substantially affected by the respective parties to this action, individually or collectively.

### III. CAUSE OF ACTION FOR BREACH OF CONTRACT

47. The foregoing Findings 1 through 44, inclusive, are incorporated by reference as to this cause of action.

48. The oral agreement between Roth and American was entered into between the end of January and early February. No better or more accurate date being ascertainable from the evidence, the Court finds that February 1, 1959, is the date of this oral agreement.

49. The essence of the contract between Precision and American was the provision that American would use its reasonably best efforts to promote and stimulate the sale and distribution of the "Chieftain" bracelet as a counterpart to the provision that Precision would sell said product to American exclusively.

50. At the time of entering into the oral agreement with Roth on February 1, 1959, American elected to and did breach its contract with Precision by ceasing to use its reasonably best efforts to promote "Chieftain" and by deciding to phase it out of its line if customers would be converted to "Safeguard". The said breach was a material breach of contract.

51. Unlike the arrangement with Roth for "Safeguard", American had complete control of promotion of the "Chieftain" pursuant to paragraph 4 of its contract with Precision. On at least one prior occasion it exercised this contract right to prevent Precision from undertaking a promotion of its product, "Chieftain". Findings 22 and 23 refer to such an occasion.

52. Although American knew that its reasonably best efforts to promote "Chieftain" adequately in the market within the meaning of paragraph 4 would and should require a greater effort than simply continuing with the same type of promotional activity undertaken in 1958 and before, American failed to use its reasonably best efforts to promote the product from and after January 1, 1959, by not undertaking a reasonable promotional effort on its part, by discouraging a reduction in the wholesale price to American and a desirable and feasible reduction in the retail price, thereby creating or unnecessarily maintaining a competitive disadvantage. Further, although having the right to determine all policies in connection with promotion, sale and distribution, including sales policies, selling price and terms of sale pursuant to paragraph 4 of its contract with Precision, American failed to use its reasonably best efforts to fix policies, selling price and terms of sale in a manner designed to reasonably and adequately promote the sale and distribution of the "Chieftain" identification bracelet from at least as early as January 1, 1959.

53. The promotion referred to in Findings 28 and 29 was not a good faith effort on the part of American to discharge its contractual duty of using its reasonably best efforts to promote "Chieftain", but on the contrary was a deliberate and knowing effort to conceal from Precision that it had determined to pursue a course of conduct in breach of its contract obligations. The letter referred to in Finding 30 was likewise a deliberate and knowing concealment of the same character.

54. Finding 31 refers to a confidential memorandum circulated by American pursuant to its determination to breach its contract with Precision. This memorandum indicates American's awareness of the importance of a competitive price structure in connection with the sale and distribution of "Chieftain" and American's willful failure to make any effort to rectify this promotional deficiency and further its determination to take advantage of this situation, which is solely under its control pursuant to its contract with Precision.

55. The parties to the contract between Precision and American did not intend to provide for a renewal of the said contract in perpetuity so long as minimum purchase requirements were met by American without respect for the desire of American to effect such renewal. It was the parties' intention and the contract provides that while American was entitled to automatic renewal from year to year upon compliance with certain conditions, it could avoid the automatic renewal by notice to this effect given a reasonable time prior to the end of a contract year. No such notice was given prior to the expiration of the contract year on April 14, 1959.

56. All of the conditions were met for the automatic renewal of the contract for the year ending April 14, 1960. There was no contract right in Precision to terminate the contract on notice or otherwise for other than certain specific causes, none of which had occurred. The contract was automatically renewed for the year commencing April 15, 1959, and ending April 14, 1960.

57. The contract between Precision and American does not permit either party to terminate the same for cause upon notice of thirty days or upon any other notice, except for certain specified causes, none of which existed at the time of or by reason of American's breach of its contract with Precision.

58. The said breach of contract was a total breach of contract within the meaning of Sections 312, 314 and 313(1) of the Restatement of Contracts.

59. By letter and telegram dated May 5, 1959, Precision by its legal counsel, gave American notice of said total breach of contract and its intention to substitute the remedial rights provided by law for all existing contractual rights. The said letter and telegram are so interpreted and construed. The thirty-day notice given in said letter is a declaration that Precision will terminate its performance of the agreement at the expiration of thirty days, although it considers itself released from its obliga-tion of performance by the breach of American.

60. At the time of the said breach, Precision was entitled to the full performance of the contract through the performance year ending on April 14, 1960. Precision did not waive any of its legal rights which accrued as a consequence of the said total breach of contract either by the letter and telegram referred to in Finding 59, by its conduct, or otherwise, and is entitled to such damages accruing from said breach throughout such performance year.

61. American could reasonably anticipate that Precision would suffer a damage and loss including a loss of profits as a consequence of its breach of contract.

62. Precision had an established and growing business. The "Chieftain" identification bracelet was a product with an established and growing market.

63. The costs of past production of the "Chieftain" bracelet were known as a consequence of experience in the production of this product. The cost of production was capable of reduction by automation of at least part of the production process and at the time of the breach Precision's plans for automation were sufficiently advanced to have been put into practice during the contract year ending April 14, 1960. This is an item which must be taken into consideration in assessment of damages.

64. An accountant witness for American testified that the cost of production of the "Chieftain" bracelet during 1959 was $5.50 per box, including in this cost, among other things, materials, supplies, outside production, salaries, repair and maintenance and royalties. An accountant witness for Precision testified that the cost of production to be anticipated for the contract year ending April 14, 1960, was $2.60 per gross, not including general administrative overhead, office salaries or depreciation on the premise that these expenses would go on anyway and, therefore, would not affect the loss of profit suffered from loss of sales due to the breach of contract. Royalties were

not included in this latter cost figure. The cost of production lies between these two figures. Some of the items of cost in 1959 would not be experienced in the future and any degree of automation may be expected to decrease costs. Furthermore, a substantial increase in sales would have little or no effect upon general administrative overhead, office salaries and certain items of depreciation. Therefore, as production increases, the production cost per box decreases. The actual cost is not precisely determinable from this evidence, but said evidence is sufficient from which to approximate cost at a given level of production with sufficiently reasonable certainty to permit an award of damages for loss of profits.

65. The quantity of lost sales cannot be determined with mathematical certainty. There is evidence concerning the quantity based upon projections of Precision's experienced increase in rate of sales and also based upon the actual quantity of sales of the "Safeguard" identification bracelet after the breach of contract. These methods neglect to take into consideration that the "Chieftain" and the "Safeguard" are not identical. The "Safeguard" contains no metal, has a wider pocket for identification material, and a lower price than the "Chieftain". It is reasonable to suppose that had there been no breach of contract, "Chieftain" bracelets would have commanded a part of the market actually obtained by "Safeguard" and would even have incidentally benefited from the promotion of "Safeguard" which served to help broaden the demand for identification bracelets generally. A substantial reduction of price of the "Chieftain" was possible without eliminating a reasonable profit. The "Chieftain" had an established market which it retained even without a reduction of price as is evidenced by the fact that American continued to sell "Chieftain" for a long time without a reduction of price. At a reasonably decreased price and reasonable promotional efforts, "Chieftain" would have experienced a substantial increase in sales were it not for the breach of contract by American. The quantity of such sales is capable of estimation, from the evidence in the record, with sufficiently reasonable certainty to form the foundation for the award of damages for loss of profits.

66. In the year 1958, American purchased Ninety Thousand Six Hundred Forty-nine Dollars and Fifty-one Cents ($90,649.51) worth of "Chieftain" bracelets. In the year 1959, the sales of "Chieftain" bracelets to American after the "Safeguard" bracelet entered into the field, dropped to Thirty-seven Thousand Four Hundred Sixty-five Dollars and Sixty-nine Cents ($37,465.69). In 1960 the sales of "Chieftain" bracelets to American dropped to Eleven Thousand Nine Hundred Twenty-eight Dollars and Thirty-three Cents ($11,928.33).

67. In the period beginning in April, 1959, and ending June 20, 1959, American had obtained orders for Sixty-five Thousand Eight Hundred Thirteen Dollars and Three Cents ($65,813.03) worth of "Safeguard" bracelets and in the last six months of the year 1959, purchased Eighty-six Thousand Four Hundred Twenty-three Dollars and Two Cents ($86,423.02) worth of "Safeguard" bracelets.

68. Each "Safeguard" box contains 250 bracelets and each "Chieftain" box contains 144 bracelets. Sixteen Thousand Eight Hundred Ten (16,810) boxes of "Safeguard" bracelets were sold by American in the period from April, 1959, to and including April, 1960.

69. Taking into consideration all of the factors which enter into an award of damages for loss of profits which have heretofore been noted, it is reasonably certain that as a direct and proximate result of American's breach of its contract with Precision, Precision has suffered a loss of profits in the sum of Fifty Thousand Dollars ($50,000.00).

## IV. CAUSE OF ACTION FOR PATENT INFRINGEMENT

70. The Court has given consideration to the primary question of the validity of the Mosher-Goldammer Patent

No. 2,893,143 and finds that it is not obviously invalid and so passes to consideration of the question of infringement.

71. Plaintiffs Precision, Mosher, D. A. Long, Charles, J. E. Long, Neilly, and Knutson, are the owners of the entire right, title and interest in and to Patent No. 2,893,143, and plaintiff Precision is the exclusive licensee under said patent with the right to make, use and sell identification bracelets under that patent.

72. The plaintiffs' Patent No. 2,893,-143, relates to a bracelet construction in which a piece of pre-formed tubing has one end stripped away to form a strap into which a plurality of holes are punched. At the other end the tubing is left intact, except that intermediate its open ends a slit is made in one side and adjacent to that slit a hook member is riveted on the inside of the tube. One section of the tube on one side of the slit defines a pocket or identification receiving section in which a piece of paper can be inserted bearing the name and other pertinent information about a wearer. The identification can be read through the clear plastic of which the tube is made. The bracelet is put around the wrist or ankle of a patient and the strap end is urged through an open end of the other section of the single tube and out through the slit. The hook inside of the tube engages one of the holes in the flat strap portion and prevents the strap from being withdrawn from the tube. After it comes out of the slit, any excess of the strap can be cut off by means of a pair of scissors or other cutting instrument. Since the hook is completely surrounded by the tube, it is difficult to disengage the hook from the hole in the strap.

73. The patent in suit contains a total of four claims which read as follows:

"1. In an identification bracelet, the combination of an elongated body having a tubular portion at one end and a strap at the other end, said tubular portion being open at its opposite extremities and said strap having fastened engageable openings therein; fastener mounting means dividing said tubular portion into identification and fastener receiving sections; and a fastener located in said fastener receiving section by said fastener mounting means and engageable with said openings in said strap.

"2. In an identification bracelet, the combination of: an elongated, unitary body incorporating a tube at one end and a strap at the other, said tube being open at its opposite ends and divided into identification and fastener receiving sections and having an opening in its wall intermediate said open ends communicating with said fastener receiving section; and a fastener in said fastener receiving section for engagement with a strap inserted through the open extremity of said last-named section and through said wall opening.

"3. In an identification bracelet, the combination of: an elongated body having a tubular portion at one extremity thereof for the reception of identification data, said tubular portion being adapted to receive the opposite extremity of said body and said opposite extremity having fastener receiving openings therein, said tubular portion having an opening formed therein intermediate its ends for the passage of said opposite extremity therethrough after insertion in said tubular portion; and a fastener located wholly within said tubular portion for engagement in one of said fastener receiving openings.

"4. In an identification bracelet, the combination of: an elongated body having a tubular portion at one extremity thereof for the reception of identification data, said tubular portion being adapted to receive the opposite extremity of said body and said opposite extremity having fastener receiving openings therein, said tubular portion having an opening formed therein intermediate its ends for the passage of said opposite

extremity therethrough after insertion in said tubular portion; and a fastener located in said tubular portion for engagement in one of said fastener receiving openings."

74. All of these claims include specific structural limitations characterizing the patented device. Each of the four claims calls for only one tubular portion, the precise language being "*a* tubular portion" in Claims 1, 3 and 4, and "*a* tube" in Claim 2. In addition, all claims recite that the tube or tubular portion is located "at one end" (Claims 1 and 2) or "at one extremity" (Claims 3 and 4) of the elongated bracelet body. Claims 1 and 2 further require that the tube or tubular portion be open at its opposite extremities or ends, and that the tubular portion be divided into two sections, the structure responsible for the division being specifically recited in Claim 1 as "fastener mounting means". Claims 2, 3 and 4 specify that the tube or tubular portion has an "opening in its wall intermediate said open ends" (Claim 2) or an "opening formed therein intermediate its ends" (Claims 3 and 4). Finally, all of the claims require that a fastener be located "in" or "wholly within" the tube or tubular portion.

75. The bracelet charged to infringe the claims of the Mosher-Goldammer patent is known as the "Safeguard" bracelet and is manufactured by Anchor Brush Company, not a party to this suit. The "Safeguard" bracelets are sold by Anchor Brush Company to defendant Forest LeJon, Inc., and, in turn, are sold by that company to defendant American, who then sells them to the public.

76. The "Safeguard" bracelet is formed of plastic and includes a tubular pocket or envelope in which an identification slip may be inserted. The pocket is closed at one end and, extending from that end is a flat strap with a series of holes therein. Spaced from the other end of the tubular pocket is a buckle through which the apertured strap may be inserted to fasten the bracelet in place.

77. Unlike the structure called for by the claims of the Mosher-Goldammer patent, the "Safeguard" bracelet does not have a tube or tubular portion at one extremity and does not have a single tube which is divided into identification and fastener receiving sections. The only tube or tubular portion found in the "Safeguard" bracelet is the identification pocket and that pocket is closed at one end. The buckle of the "Safeguard" bracelet is not a section of the tube from which the identification pocket is formed and differs susbtantially in construction from the fastener and fastener receiving section claimed in the Mosher-Goldammer patent. Specifically, the "Safeguard" buckle comprises a cross member or strip which has on its inside an inwardly projecting flexible pin or lug, but there is no covering of the pin on the inside of the bracelet, the pin instead projecting outwardly from the buckle. All of the claims of the patent in suit call for a fastener to be located "in" or "wholly within" a part of the same tube or tubular portion intended to receive an identification slip, whereas the fastener or lug of the "Safeguard" construction is not located within a section of a larger tube and is not mounted on means which divides a single tube into two sections.

78. The accused device is not constructed according to the teachings of the patent in suit and consequently does not infringe.

## V. FALSE PATENT MARKING

79. The defendants were guilty of false marking because, although the "Safeguard" bracelet was not patented, defendants Roth, TAT, Forester, and LeJon indicated in printed publicity material that the "Safeguard" bracelet was patented, and because defendant American, in its then current catalog, at page 405, used the term "Safeguard Patented Magic Safety Lock is absolutely tamperproof" in referring to the "Safeguard" bracelet, and American was responsible

for the insertion of this statement into the catalog.

80. All of the defendants, at the time of the publication referred to hereinabove, were aware that neither the "Safeguard" bracelet nor any portion thereof was patented, and the publication of these false statements constituted deception of the purchasing public by the defendants.

81. Defendants Roth, TAT, Forester, F & R, and LeJon included the false patent marking in two publications; each of these occasions constituted one offense. All of the defendants are responsible for a third offense, the reproduction of one of the aforesaid publications in the then current catalog of American.

## CONCLUSIONS OF LAW

1. All conclusions of law which appear in the foregoing Findings of Fact are incorporated herein by reference.

2. The Court has jurisdiction of the parties and the subject matter of each of the four causes of action which are a part of this consolidated action.

3. The evidence and testimony taken and received in the cause of action for violation of the antitrust laws establish that:

(a) the agreement between American Hospital Supply Corporation and defendant Leonard Roth for the sale of the "Safeguard" bracelet does not violate Section 14 of Title 15 of the U. S. Code, commonly known as Section 3 of the Clayton Act. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580.

(b) The negotiations and activities of the defendants for the introduction and sale of the "Safeguard" bracelet do not violate any of the provisions of Sections 1, 2 and 14 of Title 15 of the U. S. Code commonly known as Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, respectively, Schwing Motor Co. v. Hudson Motor Car Co., 4 Cir., 239 F.2d 176.

(c) The defendants are not guilty of any violation of the antitrust laws of the United States.

4. The evidence and testimony taken and received in the cause of action for breach of contract establish that:

(a) Defendant American Hospital Supply Corporation was bound to use its reasonably best efforts to promote and sell the "Chieftain" bracelet under the agreement with plaintiff Precision Dynamics Corporation dated January 17, 1958. Defendant American breached its said contract.

(b) The measure of damages is the profits which the plaintiff would have made on the sales of the "Chieftain" bracelet which were lost on account of the breach of the aforesaid agreement by defendant American Hospital Supply Corporation.

(c) Plaintiff Precision Dynamics Corporation is entitled to an award of damages in the amount of $50,000.00 for the breach of the said agreement.

5. The evidence and testimony taken and received in the cause of action for patent infringement establish that:

(a) Plaintiffs Mosher, D. A. Long, Charles, J. E. Long, Neilly, and Knutson are the owners of the patent in suit, No. 2,893,143.

(b) The "Safeguard" bracelet does not infringe any of the claims of the Mosher-Goldammer Patent No. 2,893,143.

(c) Since the patent in suit is not infringed it is unnecessary to decide the issue of patent validity.

6. The evidence and testimony taken and received in the cause of action for patent false marking establish that the defendants have violated 35 U.S.C. § 292 by falsely indicating in publicity relating to the "Safeguard" bracelet that the "Safeguard" bracelet or portions thereof were patented. Plaintiffs are entitled to judgment against all of the defendants in the sum of $500.00 and in addition thereto against all defendants except American Hospital Supply Corporation in the sum of $1,000.00.