In re AMICA, INC., Debtor.

Bankruptcy No. 90 B 6964.

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 3, 1992.

**538**

Mitchell R. Nagorsky, Weisman & Weisman, Chicago, Ill., for debtor.

Robert R. Tepper, Cohen, Wulfstat, Semer, Leff & Rosenberg, Ltd., Chicago, Ill., for BB Asset Management, Inc.

Thomas E. Johnson, Baker & McKenzie, Chicago, Ill., for creditor Baker & McKenzie.

Richard Friedman, Office of the U.S. Trustee, Chicago, Ill., U.S. Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause came on for trial before the Court on the claim of BB Asset Management, Inc. ("Claimant") and objection of Debtor Amica, Inc. ("Amica" or "Debtor") and creditor, Baker & McKenzie ("B & M") thereto. Claimant is assignee and transferee under Rule 3001 F.R.Bankr.P. of all rights in a certain Agreement assigned to it by Brown Bag Software, Inc. ("BBS"). The claim involves assertions by claimant of all rights of ownership, usage, marketing, and copyright in a certain computer program and damages for asserted wrongful use by Debtor of that program.

The claim is pleaded in three Counts. Count I seeks Declaratory Judgment that claimant is owner of the disputed program. Count II seeks damages for asserted breach of contract by Amica in continuing to sell or otherwise use the program. Count III seeks damages for asserted copyright infringement by Debtor.

Following consideration of all the evidence, the Court now makes and enters the following Findings of Fact and Conclusions of Law.

A key witness for claimant left the witness stand against instructions of the Court before cross examination of him was completed. Debtor and B & M jointly moved to strike his testimony. The analysis that follows first considers the evidence as though that witness's testimony stands and concludes that the claim must be disallowed even if that testimony were to stand. The analysis then demonstrates why the motion to strike testimony must be and by separate order is allowed, thereby striking much of the evidence on which claimant relies.

Pursuant to the Findings and Conclusions, by separate Judgment Order entered this date the claim is entirely disallowed and judgment is entered for Debtor.

## FINDINGS OF FACT

1. Amica and BBS entered into a written contract on or about June 22, 1989 (the "Agreement"). A copy thereof is appended as Exhibit A to these Findings and made a part hereof by this reference. Prior to entering into the Agreement, Amica had developed and sold a computer software program known as "PC-Hooker" or "PC Hookup" (hereinafter "PCH") from its Illinois offices for three years. It had achieved some market success in selling that program, with approximately $100,-000.00 per year in gross sales. Claimant is transferee, assignee and owner of any claims and rights of BBS pursuant to the Agreement. BBS was based in California. The Agreement provided for transfer of rights by Debtor to BBS in and to PCH with program modifications and related interconnecting cables. The Agreement

specifies that the law of California is to apply to its interpretation.

2. Debtor is a corporation whose stock is owned by Barry Watkins and John Dayton. Messrs. Watkins and Dayton are otherwise personally engaged in the consulting and computer software business for the insurance industry. Debtor's operations have consisted of the development and sale of software programs, one of which was PCH.

3. The function of PCH is to transfer data between lap top computers and full size personal computers. There were and are other competitive programs which perform similar functions.

4. During the spring of 1989, Debtor exhibited PCH at a trade show. The show was attended by Sanford Schupper, the President and Board Chairman of BBS. At the show, Mr. Schupper had discussions with Mr. Watkins about the possibility of BBS obtaining a license for PCH so that BBS could include PCH in certain packages of software which BBS sold.

5. Following the trade show, there ensued discussions about the possibility of Debtor selling rights in PCH to BBS. BBS was engaged in the business of marketing software, often including software which had been developed by others and purchased by BBS.

*Misrepresentations*

6. Prior to entry by Amica and BBS into the Agreement, there were negotiations between those parties. During those negotiations, in order to induce Amica to enter into the Agreement, among other things, Sanford Schupper orally represented the following on behalf of BBS:

(a) BBS was then a viable and solvent company with sufficient funds and resources to successfully promote PC Hooker in the competitive, national market place.

(b) BBS then had a strong, active, operating, and effective sales department which could and would actively and aggressively promote and market PC Hooker in the national market place.

(c) BBS had a few major-size manufacturers ready to purchase PC Hooker at that time.

7. Schupper also predicted and estimated that sales of PC Hooker would generate approximately $100,000.00 per year in royalty payments to Amica. While such remarks did not consist of a factual representation, they illustrated the scope of Schupper's representations concerning BBS's promotional and sales capabilities.

8. Sanford Schupper drafted the Agreement. While Mr. Watkins showed it to Amica's counsel, that lawyer did no drafting and did not participate in the negotiations. Discussions between the parties resulted in its execution.

9. Prior to entry by the parties into the Agreement and during the time that the foregoing representations were made, BBS was not a financially sound or solvent company. At that time, BBS owed over $3,000,000.00 in debts to various creditors, and it had been in default to several of its secured creditors in an aggregate amount of $800,000.00 for six months.

10. Prior to entry by the parties into the Agreement and during the time that the foregoing representations were made there were also substantial claims being asserted by various creditors against BBS including a number of lawsuits pending against it and unsatisfied judgments which had already been entered.

11. BBS's actual tangible assets were then approximately $450,000.00, and it was insolvent at the time that the foregoing representations were made by Mr. Schupper. In this regard, Mr. Schupper knowingly made misrepresentations. [Finding No. 6(a)] Claimant did not establish at trial its present financial capability to market PCH.

12. At the time that Schupper made the foregoing representations to Debtor, BBS did not have a sales department of the scope represented, and had no major size manufacturers lined up and ready to purchase PC Hooker. In this additional regard, Mr. Schupper knowingly misrepresented. [Finding Nos. 6(a) and 6(b)] Claimant did not establish at trial its present

ability to conduct a national marketing effort through an existing sales force, nor did it establish that it has now obtained any identified major purchasers of PCH.

13. The foregoing misrepresentations made by Schupper (Finding No. 6) were material to Amica. The potential value to Amica from dealing with BBS under the Agreement was to obtain in BBS a financially stable major marketing potential that might generate large royalties in place of promising but still modest direct sales by Amica. Amica relied upon those misrepresentations and was mislead by them into entering in the Agreement with BBS and into performing its side of the Agreement.

14. Following execution of the Agreement, Amica discontinued its marketing of PC Hooker and for several months Amica was dependent upon marketing by BBS in order to receive income therefrom pursuant to the Agreement.

### Breach of Warranty

15. In the Warranties, Representations and Indemnification section of the Agreement (Exhibit A hereto, Section 4; page 3), BBS warranted that it would "use its best efforts to aggressively market and promote" PCH and related products. That warranty related directly to Mr. Schupper's foregoing representations (Finding No. 6), and meant in context that BBS warranted that it possessed and would use its represented financial strength, resources, and strong sales department to engage in an aggressive and effective national marketing effort and promotional campaign.

16. Schupper also mentioned to Watkins that he had several marketing ideas in mind, including a magazine insert of one million diskettes. While this was not a contract term or itself a representation, it illustrated the large and expensive scope of activity promised in the warranty of "best efforts to aggressively market and promote" PCH.

17. The substantial marketing efforts promised and warranted to Amica were never materially undertaken by BBS. No major marketing program or promotional campaign was ever furnished or carried out by BBS to sell PCH. Certainly no program of the scope warranted ever materialized. Indeed, BBS lacked resources, organization, and personnel necessary to launch such a program.

### Anticipatory Repudiation, Breach of Contract and Failure of Consideration

18. Certain modifications to PCH were agreed to be performed by Debtor in phases. The Agreement provided that BBS would make payment to Amica for specified Phase One modifications upon delivery of those modifications, and would pay one-half of the payment due for Phase Two modifications upon Amica's commencing the latter modifications. (Exhibit A hereto, Section 2, last paragraph)

19. Following execution of the Agreement, the parties modified the specifications for revisions to the computer software program by oral agreement and written communications.

20. BBS agreed to pay for all cost of modifications pursuant to the revised specifications.

21. When the Agreement was signed, the computer software program which BBS was to purchase had not yet been created in the form provided in the Agreement. That software program was to be developed and modified by Debtor's programming efforts after the Agreement was signed.

22. The Agreement provides that Brown Bag was to pay to Amica the following payments, among others, specified:

a. A $5,000.00 royalty payment within fourteen (14) days of BBS's receipt of the modified software program suitable for shipment. (Exhibit A hereto, No. 1, Section 3);

b. Costs of modifications to PC Hooker which were requested by BBS and to be provided by Amica. (Exhibit A hereto, Section 2); and

c. A total of $11,175.00 as payment for attendance at three designated trade shows. (Exhibit A hereto, Section 7)

23. BBS never made any of the foregoing payments to Debtor which were required of it under the Agreement.

24. Amica never shipped the final version of the PCH computer software program, although it did substantially complete it in accordance with specifications. However, BBS had defaulted on several payments due from it by the time delivery of the final version was possible, and Debtor reasonably felt and was in fact financially insecure in its relations with BBS. BBS failed to provide adequate assurance that it would pay for the modifications upon delivery as required by the Agreement, or for other payments due from it.

25. Although Amica sent several versions of the computer software program to BBS, BBS repeatedly rejected such versions of the program for asserted non-conformity, or for alleged defects, expressed orally or in writing. (Debtor's Exhibit Nos. 11, 16, and 19)

26. BBS claimed that various versions of the computer software program shipped to it contained "bugs" and were, therefore not in conformity with the Agreement. Nonetheless, BBS sent two checks in payment therefore, retained possession of the various versions of the computer software program, made additional minor modifications to them, and took some preliminary steps to market the modified computer software program it had received from Debtor.

27. The first check from BBS in the amount of $12,000.00 was dishonored by its bank. Its second check in the amount of $5,000.00 was also dishonored. Debtor therefore frequently requested orally and in writing that BBS make good on these checks and provide assurances that it would be able and willing to pay if Amica continued with further modifications to and delivery of the final software program. (Debtor's Exhibit Nos. 13, 15 and 17)

28. For a three month period following execution of the Agreement, Debtor continued to develop modifications to the computer software program as requested by BBS in hope of obtaining payment on the dishonored checks and assurances of further payment due or to become due. However, it suspended final delivery of the completed software while waiting for the several payments due or some reliable assurance of payment.

29. During that three month period, BBS made one payment in the amount of $5,000.00 toward the total of $48,000.00 then owed by it to Debtor for various other payments due under the Agreement. This $5,000.00 payment was made for technical documentation, the user manual.

30. The consideration for Amica's agreement to modify its PC–Hooker computer software program and sell rights in it to BBS was the promise of BBS to pay for all such modification expenses concurrently with delivery, to pay a running royalty of ten percent (10%) on its sales of software, and related products, and to pay the costs of three designated trade shows. (Exhibit A hereto, Sections 2, 3 and 7) A total of about $43,000 in such payments due from BBS went unpaid when due and is still unpaid.

31. After three months had passed following dishonor of the first BBS check, after many evasions it admitted in writing and orally from Mr. Schupper that it was unable to pay at that time the remainder of what it owed, and did not know when it would be in a financial position to pay. It requested that the Agreement be modified to permit it to pay for modification expenses out of future sales instead of upon delivery of the computer software program as required by the Agreement. (Debtor's Exhibit No. 19)

32. Barry Watkins, President of Debtor, offered on several occasions to return the $5,000 received from BBS and to rescind the Agreement, but BBS repeatedly refused.

33. In order to reduce its damages and obtain income for its business survival, Debtor cancelled the Agreement on October 31, 1989 by written letter from Barry Watkins, President of Amica, to Sanford Schupper, President of BBS. Debtor then resumed selling its computer software program PC–Hooker. (Debtor's Exhibit No.

20) Before cancelling the Agreement, Amica had waited over 90 days (from July 27, 1989 when the BBS check for $12,000 was dishonored until October 31st) while trying to obtain payment of the moneys due it from BBS. (Debtor's Exhibit Nos. 10, 13, 14, 15, 17, 20)

34. Payment by BBS for modifications of Phase One work, and one-half of cost of modifications for Phase Two, were conditions precedent to Debtor's obligation to make delivery of the final computer software program.

35. BBS sold the PC Hooker software as part of its Power Menu Plus software package but failed and refused to account for such sales or for royalties due for such sales.

36. BBS never paid any royalty payments to the Debtor.

37. Debtor performed all of its obligations under the Agreement.

38. The misrepresentations made by BBS (Findings 6 through 13) enabled it to gain physical control of Debtor's PC–Hooker software program. This allowed BBS to begin selling that software program without paying for modification fees, advance royalty payments and three trade shows which it had promised to pay for in the Agreement.

39. The Agreement drafted by Mr. Schupper is ambiguous on its face and must be read closely to glean intent of the parties to the extent that is possible from the document itself. (In the discussion that follows, emphasis is supplied as to all underlined words.)

First, the preamble recites that Amica "has created the original computer programs described in Schedule A hereto (the '*Product*') which Seller desires to sell to BB." Schedule A attached to the Contract refers to existing software programs:

"Schedule A

The complete programs contained in a product currently marketed as PC–Hooker and/or Rapid Transit and all documents and antecedents thereof."

If the description of "Product" had stopped there, it would have referred to existing programs. However, Page "A–1" attached to Schedule A provides for several future modifications of those programs in two phases, to be renamed "PC–HookUP." Therefore, while certain programs existed, the ultimate "Product" to be sold (as defined in Schedule A and the attached page A–1 that comprised part of the definition of "Product") was not yet in existence.

In ¶ 1 of the Agreement, Amica "irrevocably transfers to BB all its rights, title and interest to the *Program* and *its* documentation including copyright in the programs and the documentation with respect thereto, and all trademarks." The term "Program" is not defined.

In the second sentence of ¶ 1, Amica agrees to execute all assignments and other documents necessary "to effect or record the transfer of Seller's copyrights and other rights in the *Product* to BB on an exclusive basis", and that such transfer "shall not be subject to termination or revocation under any circumstances except ... (under the Copyright Act)." The Agreement thereby contemplated future execution of other documents to effect the transfer of rights in the "Product", meaning by definition the programs after they were modified; the transfer was thereby indicated for the future, not by the Agreement itself. No future documents of transfer or assignment were ever executed by Amica.

The word "Program" (with initial capital letter) appears in several places in the Contract, but is nowhere defined. The Agreement distinguishes, however, between references to the "Product" and the "Program(s)":

¶ 1  "*Program* Service Code for Product"

¶ 2  Seller to correct errors in the "*Programs*" and "Sellers agrees to modify the *Program* as per Schedule A(i)...."

¶ 3  The first royalty advance by seller was to be due fourteen days after "their (sic) receipt of the *Purchased Program* suitable for shipment...." (But royalties were to be computed on sales of "Product"!)

Each royalty payment was to be accompanied by reports as to copies of *"each Program"* sold. A minimum royalty of $25,000 was due at the end of 36 months beginning that date BBS shipped its version of *"the Product"* to customers. If the royalty is not paid after the 36 month period, "then Title to the *Program* will revert to Amica," leaving it and BBS with rights in each to market *"the Product."*

¶ 4 Amica warranted that *"each Program"* does not and will not violate rights of third parties, and no other parties have rights "to any of the *Program.*"

The final warranty in ¶ 4 was that of BBS, that it "will use best efforts to aggressively market and promote the *Purchased Products.*"

Section 5 dealt with computing royalties in event of ownership disputes, with costs of such disputes to be deducted from the revenues received from all of the *Programs* ... and later phrases refer to an individual *"Program"* subject to dispute.

In ¶ 7, the Agreement supersedes any other agreements "with respect to the *Programs.*"

After fixing costs of trade shows to be paid for by BBS, ¶ 7 provides that Amica "may purchase finished *Product,*" at cost of BBS, for sale to Amica's insurance customers and dealers "for the *Product,*" for exclusive use by BBS. Upon signing of the Agreement, Amica was to deliver to BBS a list of all its customers and dealers "for the *Product,*" for exclusive use by BBS. The last sentence of ¶ 7 specifies that the Agreement is the "complete and exclusive statement" of their agreement "relating to the Purchase and Sale of the *Product.*"

From the foregoing terms, and consistent with other evidence, it appears that with some ambiguity in drafting:

1. Amica was to sell BBS all rights to the then existing programs but only after those programs were modified for BBS use (and became the defined "Product").

2. Amica was to develop the agreed modifications of the existing programs so as to develop the Product through modification of software and programs in two future stages in return for required payments by BBS.

3. The "Program" in which Amica "transfers" rights to BBS in the first sentence of ¶ 1 was to be the "Product" as defined but only after the agreed future program modifications were completed so as to complete the "Product". Where the Agreement refers to transfer to BBS "irrevocably" of all rights to "the Program," an otherwise undefined term, that phrase is explained in the second sentence of ¶ 2 whereby Amica was to assign and transfer all "rights in the *Product*" to BBS "on an exclusive basis" only after the Product was fully developed and that developed Program was ready for and accepted by BBS.

Given the ambiguous reference to "Program" in the first sentence of ¶ 1 which "irrevocably transfers" (in the present tense) all right and title to the undefined "Program," the intent of the parties must be interpreted from the rest of the document and other evidence admitted.

From all the evidence, and regarding the Agreement as a whole, it is clear that title in and right (including copyright rights) to the defined "Product" were intended to pass only after the Program modifications were created by Amica and paid for by BBS. The original programs plus modifications thereto would comprise at that later date the entire "Product" to be sold. After documents of assignment were signed and title thereto passed "irrevocably" under ¶ 1, Amica would have no rights to use it or any part of it for three years, and thereafter only if BBS failed to pay the $25,000 minimum royalty. (¶ 3)

Section 3 also made clear that BBS's first royalty payment was due as an advance 14 days after its receipt from Amica "of the Purchased Program suitable for shipment."

Irrevocable title to the existing software programs and future modifications thereof

was intended to pass after Amica completed and paid BBS for requisite modifications. Only then, after the future developments were completed and paid for, was the "transfer" to take place of Amica's interest in all computer programs involved in the Agreement and referred to in ¶ 1 of the Agreement.

Transfer of the contractually undefined "Program" in ¶ 1 was to be made "[e]xcept as provided in Paragraph 3." Paragraph 3 contained provisions consistent with the foregoing analysis. There is found a post transfer provision for reversion of usage and sale rights to Amica if the minimum royalties were not paid after 36 months. The date of first shipment to BBS customers was to fix the date the 36–month period would start to run. Paragraph 3 makes clear that these royalty terms were to be triggered only by delivery by Amica of the fully modified group of programs, ready for shipment to BBS customers.

The rest of the Agreement makes clear that delivery of the final "Purchased Program suitable for shipment" required payment by BBS for the modifications and its acceptance of the fully modified product and execution by Amica of transfer documents. None of those acts ever occurred. Accordingly, the transfer of rights contemplated under ¶ 1 never took place.

The Claimant's view is that ¶ 1 effected a transfer of valuable rights concurrent with execution of the Agreement, without payment of a dime at that time by BBS and despite its failure subsequently to pay more than a small part of what it promised to pay and its lack of ability to market the product as promised. That reading is not compatible with the rest of the Agreement and provisions for future modifications of the product, not in accord with discussions of the parties, not in accord with commercial reality, and in the absence of precise and unambiguous contract terms precisely saying as much that interpretation cannot be fairly and logically read into the Agreement.

40. Transfer of the PC Hooker program was also subject at time of transfer to execution of a copyright assignment. Such assignment was never executed by Amica. Had the transfer of rights under ¶ 1 ever taken place, then in the absence of a separate copyright assignment agreed to by Amica, BBS could perhaps have used the language of ¶ 1 to register the copyright in its own name. But its right to do so was never triggered by a "transfer". Therefore, the purported copyright registration by BBS was unauthorized.

*Schupper's Departure from the Stand*

41. Before Mr. Schupper testified, the Court ruled that both Debtor and B & M had standing to examine and cross examine witnesses. After Mr. Schupper testified on direct, he was cross examined by Debtor's counsel but not by counsel for the objecting creditor B & M. Counsel for Debtor and counsel for that Creditor had agreed on different areas of cross examination. Debtor's counsel finished his agreed portion, and B & M's counsel began. However, about 5:00 P.M., an hour before this Court generally recesses, Mr. Schupper suddenly announced that he had a plane to catch back to California. The Court suggested that he could arrange a later flight that night, or return to California the next day, but he declined to do either. Without being excused, he walked off the stand despite the Court's request that he remain so that cross examination could be completed. He refused, but said he would return for the next scheduled court day. The Court informed him of the next court day and hour, and warned him and Claimant's counsel that Mr. Schupper's testimony could be stricken for walking off the stand against Court orders if he did not return on the next scheduled date.

Mr. Schupper then flew back to California, but he did not return to the courtroom on the next court date. On that day claimant's counsel reported that to return from California Mr. Schupper had chosen to drive a housetrailer from California to Colorado and then fly from Colorado to Chicago, but the drive took longer than anticipated. The trial ended on that date. Accordingly, Debtor lost an opportunity to inquire into many significant areas because its

counsel reasonably believed that creditor's counsel would be able to do so. Creditor's counsel also lost the opportunity to cross examine into those areas. The Debtor and creditor B & M filed an exhibit listing the proposed lines of examination from which they were foreclosed. (Exhibit B hereto.) The areas not cross examined into were most significant to defense against the claim.

Pursuant to the foregoing, Debtor and the objecting creditor B & M were blocked by Mr. Schupper's conduct from highly significant areas of cross examination.

### Miscellaneous

42. Debtors's President Mr. Watkins was a stable, sincere, credible witness. Mr. Schupper had a flippant attitude and manner when he was testifying that gave the Court doubts about his credibility. His bizarre stunt in walking off the stand without permission and refusing to allow complete cross examination lost him any credibility he might otherwise have claimed for testimony that conflicted with that of Mr. Watkins.

43. Facts set forth in the Conclusions of Law will stand as additional Findings of Fact. Any Conclusions of Law set forth in the fact Findings will stand as additional Conclusions.

## CONCLUSIONS OF LAW

### Jurisdiction

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.

2. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### Governing Law

3. Under California law, Debtor and BBS could and did properly agree that the law of the State of California would govern their rights and duties. West's Ann.Cal.Comm.Code § 1105(1). The transaction bore a reasonable relation to California because the business of BBS was based there. Parties to a contract can control choice of law by including in their Agreement an express provision as to which state

law should govern. Robert A. Leflar, AMERICAN CONFLICTS LAW, § 147 (1977). The state law chosen by parties to govern their contractual rights and duties will be applied to issues dealt with by provisions in their agreement directed to these issues. ALI Restatement of Conflicts of Law 2d; §§ 187 and 188 (1971).

4. The validity of a contract in respects other than capacity and formalities, is determined by the law selected. ALI Restatement of Conflict of Laws 2d; § 200 (1971).

5. The effect of misrepresentation is to make a contract voidable, *Langley v. FDIC*, 484 U.S. 86, 94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987); *Restatement (Second) of Contracts*, §§ 163–64 (1979), and issues of voidability are matters of substance as to which the parties' choice of law will be honored. *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2nd Cir.1987). Therefore, the effect of misrepresentation upon a contract is determined by law of the state selected in an agreement. ALI Restatement of Conflict of Laws 2d; § 201 (1971).

### Interpretation of the Agreement and Parol Evidence

6. The California Commercial Code applies to transactions in goods. West's Ann.Cal.Comm.Code § 2102. It defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." West's Ann.Cal. Comm.Code § 2105. The terms "goods" includes computer programs. *RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543 (9th Cir.1985).

7. "Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale for future goods or of any interest therein operates as a contract to sell." West's Ann.Cal.Comm.Code § 2105(2).

8. The California Commercial Code is supplemented by the principles of law and equity, including the law merchant and the law relative to capacity to contract, fraud, misrepresentation, or other validating or invalidating causes. West's Ann.Cal. Comm.Code § 1103.

9. The Agreement executed by Debtor states the following in the last paragraph:

"The parties have read this Agreement and agree to be bound by its terms and further agree that it constitutes the complete and exclusive statement of the Agreement between them which supersedes all prior proposals, oral or written, and all other communications between relating to the Purchase and Sale of the Product."

Paragraph 7 provides:

"This Agreement supersedes any and all other agreements, oral or written, between the parties with respect to the Programs."

Section 1856 of the California Code of Civil Procedure provides:

"Terms in writing intended as final expression of Agreement; exclusion of parol evidence; exceptions.

"(a) Terms set forth in a writing intended by the parties as a final expression of their Agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior Agreement or of a contemporaneous oral Agreement.

"(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the Agreement ...

(e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue.

(f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue.

(g) *This section does not exclude other evidence* of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or *to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud.* (Emphasis supplied.)

10. Section 1625 of the California Civil Code provides that "the execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

11. In *Parker v. Meneley,* 106 Cal. App.2d 391, 235 P.2d 101, 105 (1951) plaintiff recovered on an oral contract. The Court of Appeal reversed because there was also a writing between the parties, but only because that writing was clear and unambiguous:

"... the written instrument and the oral agreement, if there was one, eventuated from the same previous negotiations and covered the same subject matter. And if these contracting parties, after these preliminary negotiations concerning the subject matter involved, came to an understanding and then adopted and executed these written instruments as the final and complete express thereof, the result was an integrated Agreement to which the parol evidence rule concerning such documents would apply. Further, if after such negotiations concerning a definite subject matter of contract a written instrument is executed covering that subject matter and purporting to state the contractual obligations and rights of the parties, *which instrument is upon its face complete, clear and adequate,* it is to be presumed that it was executed by the parties with the intention to adopt it as the final and complete expression of their Agreement." (Emphasis supplied.)

12. Despite the foregoing authority, claimant argues that parol evidence heard by the court was not admissible to explain the ambiguous writing because it is "integrated". "An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An inte-

gration is the writing or writings so adopted." 3 Corbin on Contracts § 588. The parol evidence rule applies to "integrations". *Id.* The Agreement here purports to be an "integration" in the last paragraph of that document.

■■■■ 13. Parol evidence may be used for a variety of purposes when interpreting an integrated agreement:

(a) Parol evidence is admissible to explain ambiguities or undefined terms in a contract. West's Ann.Cal.Comm.Code § 2202; *McKeon v. Santa Claus of Cal., Inc.*, 230 Cal.App.2d 359, 41 Cal.Rptr. 43, 46 (1964).

(b) Parol evidence is admissible where validity of an agreement is an issue in dispute. West's Ann.Cal.Code of Civ. Proc. § 1856(g).

(c) Parol evidence is admissible to show intention of the parties in using certain terms in a contract. *Southern Pac. Co. v. Hyman–Michaels Co.*, 63 Cal. App.2d 757, 147 P.2d 692 (1944). When the contract terms are ambiguous, prior negotiations may be considered as well as subsequent acts of the parties in ascertaining the true intention of the parties. *City of Stockton v. Stockton Plaza Corp.*, 261 Cal.App.2d 639, 68 Cal. Rptr. 266 (1968).

(d) The course of performance by the parties here is also relevant to determine the meaning of ambiguous or undefined Agreement terms. West's Ann.Cal. Comm.Code § 2208(1).

(e) A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. West's Ann.Cal.Civil Code § 1647. The Court may consider the circumstances under which a contract was made so that the trier of fact may be placed in the position of those whose uncertain and ambiguous language is to be interpreted. West's Ann.Cal.Code of Civil Procedure § 1860.

■■■■ 14. Parol evidence was admissible at the trial in this case for all these purposes. As pointed out in the Findings of Fact, this Agreement is rife with ambiguity. Thus, parol evidence was admissible

at trial to explain the ambiguities. It was also admissible to allow Amica to establish fraudulent inducement on the part of BBS. It was particularly appropriate and necessary in this case to admit parol evidence to establish intent of the parties because the Agreement was drafted by a lay person and contained ambiguities. In sum, parol evidence was necessarily admitted in order to explain and understand the Agreement and the terms used therein.

15. California Civil Code ("Civil Code") provides the following general rules for contract interpretation:

(a) *Section 1636. Contracts, how to be interpreted.* A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.

(b) *Section 1637. Intention of parties, how ascertained.* For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied.

(c) *Section 1638. Intention to be ascertained from language.* The language of a contract is to govern its interpretation, if the language is clear and explicit and does not involve an absurdity.

(d) *Section 1639. Interpretation of written contracts.* When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.

(e) *Section 1641. Effect to be given to every part of contract.* The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

(f) *Section 1643. Interpretation in favor of contract.* A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.

(g) *Section 1644. Words to be understood in usual sense.* The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

(h) *Section 1652. Repugnancies, how reconciled.* Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract.

(i) *Section 1654. Uncertainties; Interpretation against person causing.* In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted more strongly against the party who caused the uncertainty to exist.

■ 16. Mr. Schupper of BBS prepared the Agreement in dispute, and any ambiguities or questions of contract interpretation must be resolved against BBS as the party which prepared the contract. *Victoria v. Superior Court (Kaiser Foundation Hospitals),* 40 Cal.3d 734, 222 Cal. Rptr. 1, 710 P.2d 833 (1985); *Interpetrol Bermuda Ltd. v. Kaiser Aluminum Int'l. Corp.,* 719 F.2d 992 (9th Cir.1983).

■ 17. The meaning of the Agreement here must be ascertained from a common sense reading of it as a whole, and particular clauses in a contract are subordinate to the general intent. West's Ann.Cal.Civil Code § 1650; *Broome v. Broome,* 104 Cal.App.2d 148, 231 P.2d 171 (1951). See also West's Ann.Cal.Civil Code § 1653 ("Words in a contract which are wholly inconsistent with the nature or with the main intention of the parties are to be rejected"). Thus, the court will view the language of the Agreement in light of its nature as a whole and not use a disjointed, single-paragraph, strict construction approach. *Appalachian Ins. Co. v. McDonnell Douglas Corp.,* 214 Cal.App.3d 1, 262 Cal.Rptr. 716 (4th Dist.1989).

■ 18. An interpretation of the Agreement which would make it extraordinary, harsh, unjust, inequitable or which would result in absurdity, should be avoided unless plainly mandated by its terms. *Marin County v. Assessment Appeals Bd., Marin County,* 64 Cal.App.3d 319, 134 Cal. Rptr. 349 (1st Dist.1976).

19. As noted in Finding No. 39, the Agreement is ambiguous and unclear. This Court resorted to all parts of the Agreement and the testimony and other evidence admitted to read the Agreement so as to effect the intent of the parties. Having applied the rules of evidence and contractual interpretation laid out above, this Court concludes:

—Title to the completed and modified programs was not intended to and did not pass before the modifications were completed by Amica and accepted and paid for by BBS.

—Those modifications were materially completed but never accepted or paid for by BBS.

—BBS failed to make substantial payments otherwise due from it, and admitted inability to do so.

—Before title to the program or any part of it ever passed, Amica rescinded the Agreement.

### Fraud in the Inducement

20. In order for a binding contract to be created, the parties must freely give their consent to enter into the contract. West's Ann.Cal.Civil Code §§ 1550, 1565. Consent is not freely given when a party is induced to enter into an agreement by fraud. West's Ann.Cal.Civil Code § 1567.

21. Fraud may be either actual or constructive. West's Ann.Civil Code § 1571, and annot. cases cited. While fraud consists of several basic elements, California courts recognize that no exact universal definition of fraud is possible. As was explained in *Wells v. Zenz,* 83 Cal.App. 137, 256 P. 484 (1927),

Fraud is a generic term which embraces all the multifarious means which human ingenuity can devise and are resorted to by one individual to get an advantage

over another. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and unfair way by which another is deceived . . .

22. Actual fraud occurs when a party to a contract, with intent to deceive another party thereto, or to induce him to enter into the contract commits any one of the following acts: the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; the suppression of that which is true by one having knowledge or belief of the fact; a promise made without any intention of performing it; or any other act fitted to deceive. West's Ann.Cal.Civil Code § 1572; *Michaels v. Morris*, 169 Cal.App.3d 809, 215 Cal.Rptr. 569 (2nd Dist.1985).

■ 23. Constructive fraud exists when conduct, though not actually fraudulent, had all actual consequences and all legal effects of actual fraud. *Agair, Inc. v. Shaeffer*, 232 Cal.App.2d 513, 42 Cal. Rptr. 883, 886 (3rd Dist.1965). Constructive fraud consists in any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him. West's Ann.Cal.Civil Code § 1573.

■ 24. Negligent misrepresentation is given statutory recognition as a form of deceit. Under California Civil Code, § 1710, subd. 2, it is the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true. Under Civil Code § 1572, subd. 2, it is the positive assertion by a contracting party, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true. Hence, broad statements that "scienter" is an element of every cause of action for deceit, and that an intent to deceive is essential, are not accurate, since neither scienter nor intent to deceive is a requisite for negligent misrepresentation. *Hale v. George A. Hormel & Co.*, 48 Cal. App.3d 73, 84, 121 Cal.Rptr. 144 (4th Dist. 1975).

■ 25. Although one may be under no duty to volunteer information, if he responds to an inquiry, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a fair and full disclosure. *Rogers v. Warden*, 20 Cal.2d 286, 289, 125 P.2d 7 (1942).

■ 26. A duty of disclosure may exist when one party to a transaction had sole knowledge of or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party. *Goodman v. Kennedy*, 18 Cal.3d 335, 347, 134 Cal.Rptr. 375, 556 P.2d 737 (1976).

■ 27. In the formation and performance of every contract of sale, the parties have a duty to deal in good faith. West's Ann.Cal.Comm.Code § 1203. Good faith is the duty of honesty in fact and conduct. West's Ann.Cal.Comm.Code § 1201(19). *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 328 P.2d 198 (1958). Fraud is a type of bad faith because it is a form of sharp dealing and advantage-taking which produces no social benefit. As the Seventh Circuit explained in *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 594 (7th Cir.1991),

[I]t is one thing to say that you can exploit your superior knowledge of the market—for if you cannot, you will not be able to recoup the investment you made in obtaining that knowledge—or that you are not required to spend money bailing out a contract partner who has gotten into trouble. It is another thing to say that you can take deliberate advantage of an oversight by your contract partner concerning his rights under the contract. Such taking advantage is not the exploitation of superior knowledge or the avoidance of unbargained-for expense; it is sharp dealing. Like theft, it has no social product, and also like theft

it induces costly defensive expenditures, in the form of overelaborate disclaimers or investigations into the trustworthiness of a prospective contract partner, just as the prospect of theft induces expenditures on locks. See generally Steven J. Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 Harv.L.Rev. 369, 393 (1980).

■ 28. The quantum of evidence required to support a finding of fraud is a preponderance of the evidence. *Liodas v. Sahadi,* 19 Cal.3d 278, 289–290, 137 Cal. Rptr. 635, 562 P.2d 316 (1977).

■ 29. In the light of the foregoing principles, Amica was fraudulently induced to enter into the Contract. Mr. Schupper made a series of false statements concerning the state of his company and its abilities to fulfill its end of the bargain. See Findings of Fact 6 to 13. Debtor has shown by a preponderance of evidence that these misrepresentations were made with the intent to defraud. Even if such intent were lacking, it is clear beyond a doubt that Mr. Schupper was at least negligent in his misrepresentations and deceit, insofar as he should have known of the true condition of his company. Furthermore, by acting dishonestly to induce Amica to make and stay with the Agreement, BBS clearly violated its duty of good faith and fair dealing. In fact, the conduct of BBS and its agent, Mr. Schupper, was plainly not honest. Thus, BBS was responsible for constructive fraud and also breached its duty of good faith by misleading Amica to its detriment.

30. The remedies for fraud include all remedies for breach of contract. West's Ann.Cal.Comm.Code § 2721. Under California law, such remedies included cancellation of a contract. West's Ann.Cal.Comm. Code § 2703(f). Since Amica was fraudulently induced to enter into the Agreement, it was entitled to cancel it.

### Breach of Contract

31. A seller has the obligation to transfer and deliver goods as agreed, and a buyer has the obligation to accept and pay in accordance with the Contract. West's Ann.Cal.Comm.Code § 2301. The buyer must pay for any goods accepted. West's Ann.Cal.Comm.Code § 2607(1).

32. If a buyer claims goods are not conforming due to defects, the buyer must return the goods to the seller and cannot exercise any ownership over the goods. West's Ann.Cal.Comm.Code § 2602(2)(a). If a buyer exercises ownership over the goods, it has accepted the goods and must pay. West's Ann.Cal.Comm.Code § 2606(1)(c).

33. The tender of payment is a condition to the seller's duty to tender and complete any delivery. West's Ann.Cal.Comm. Code § 2511(1). Payment by check is conditional and is defeated as between the parties by dishonor of the check. West's Ann.Cal.Comm.Code § 2511(3).

■ 34. A seller's remedy for breach includes cancellation of the contract. West's Ann.Cal.Comm.Code § 2703(f). By marketing PCH, BBS accepted the software and acted in a manner inconsistent with its articulated rejection. BBS then breached the Agreement by failure to make payments due under the Agreement and by attempting to market PCH before making such payments. Amica was therefore entitled to cancel the Agreement.

### Anticipatory Repudiation and Breach

35. If grounds arise showing seller's insecurity because the buyer will be unable to pay, the seller may suspend its own performance and demand that the buyer provide adequate assurance that it will perform the agreement. West's Ann.Cal. Comm.Code §§ 2609(1), 2610(c) and West's Ann.Cal.Civil Code § 1440. Acceptance of part payment does not prejudice the insecure seller's right to demand adequate assurance of complete performance. West's Ann.Cal.Comm.Code § 2609(3).

36. Failure to provide adequate assurance within a reasonable time, but no more than thirty days, is a repudiation of the contract by the buyer. West's Ann.Cal. Comm.Code § 2609(4).

37. When a buyer repudiates a contract, the seller may resort to any remedy for

breach. West's Ann.Cal.Comm.Code § 2610(b). Where a buyer repudiates with respect to a part or the whole of the contract, the seller's remedies for breach include the right to withhold delivery of the goods and to cancel the agreement. West's Ann.Cal.Comm.Code § 2703(f) and West's Ann.Cal.Civil Code § 1440.

38. The buyer cannot retract repudiation after cancellation. West's Ann.Cal. Comm.Code § 2611(1).

39. The seller still retains its claims for damages due to breach upon cancellation. West's Ann.Cal.Comm.Code § 2106(4).

40. Where a purchaser has defaulted in complying with any of the vital terms of the Agreement, the seller has the choice and option to treat the contract as involving a conditional sale and retake possession of the property, or to ratify the contract as one involving an absolute sale of the property and sue for the recovery of all monies then payable thereunder. *Johnson v. Kaeser*, 196 Cal. 686, 694, 239 P. 324 (1925); *B.K.K. Co. v. Schultz*, 7 Cal.App.3d 786, 793, 86 Cal.Rptr. 760 (2nd Dist.1970).

41. The Debtor effectively cancelled and terminated the Agreement in this case by letter sent from the Debtor to BBS on October 31, 1989. Before then BBS had legally repudiated the Agreement and Debtor was obviously insecure due to the long period of repeated nonperformance by BBS of its duty to make several required payments. Amica therefore was entitled to terminate the Agreement.

42. Debtor's duty to complete delivery of the final software was conditional upon it receiving adequate assurance that the buyer BBS would pay. West's Ann.Cal. Comm.Code §§ 2609(1), 2610(c) and West's Ann.Cal.Civil Code § 1440. A seller need not deliver if the buyer indicates it cannot pay. West's Ann.Cal.Comm.Code §§ 2609(1) and 2610(c) and West's Ann.Civil Code § 1440.

43. Before the buyer can require the seller to perform, it must fulfill all conditions precedent and conditions concurrent. West's Ann.Cal.Civil Code § 1439. Where as here the buyer substantially fails to pay,

the seller may cancel the agreement. West's Ann.Cal.Comm.Code § 2703(f). Amica had that right and exercised it.

44. If the evidence is viewed as showing rejection by BBS of the programs as modified (through its complaints about the modifications), Amica had a duty to mitigate damages by cancelling the agreement and selling to another customer those goods that BBS did not accept. West's Ann.Cal.Comm.Code § 2610, Comment 1.

45. Any provision in an agreement which limits the seller's remedy for breach in a way to deprive the seller of the substantial value of its bargain is unconscionable and void. West's Ann.Cal.Comm. Code § 2719, official comment 1. Even if the Agreement were read as argued by claimant so as to deprive Amica of any meaningful remedy, such would be void.

*Failure of Consideration*

46. The essential elements of a contract are:

(1) parties capable of contracting;

(2) mutual consent;

(3) a lawful object of the agreement; and

(4) consideration.

West's Ann.Cal.Civil Code § 1550.

47. Failure of consideration is a sufficient ground for cancelling a contract. West's Ann.Cal.Civil Code Section 1689(b)(4). See also West's Ann.Cal.Civil Code Section 1605. Here, consideration due Amica failed not only because of substantial nonpayment by BBS, but also because of the critical lack of financial stability and marketing capability which was warranted by BBS and depended on by Amica.

48. Executory contracts may be rescinded for failure of consideration. If a contract is fully executed and implemented, then there is nothing left to rescind. See *Williams v. Reich*, 123 Cal.App. 128, 10 P.2d 1030 (1932). It is impossible to maintain that a failure of consideration occurred when the contract has been fully executed because by definition, full execution means that consideration has been ful-

filled. *Chavez v. Industrial Accident Commission*, 49 Cal.2d 701, 321 P.2d 449, 451 (Carter, J., dissenting) (1958). Here however, the transfer of rights in the finished "Program" never took place, and was not to take place until modifications were completed and accepted and some designated payments had been made. The Agreement was for a sale which would not take place until after preconditions as to certain payments and acceptance by BBS of the final Program occurred. Accordingly, the Agreement was executory and could be rescinded.

49. Moreover, pursuant to 9 Cal.Jur.2d Section 23, a grantor can avoid even an executed transfer, for failure of consideration, for fraud, for false representations, or where as here actual performance by the transferee is a condition effecting the validity of the transfer. Compare *Michaels v. Morris*, 169 Cal.App.3d 809, 215 Cal.Rptr. 569 (rescinding a contract on the basis of fraud), and *Williams v. Reich*, 123 Cal. App. 128, 10 P.2d 1030 (not rescinding a contract because no evidence of fraud was present).

### Breach of Warranty

50. The failure and inability of BBS to use aggressive efforts to market and promote PC–Hooker in the range of staffing and promotional efforts described by its President and warranted in the Agreement was a material breach of contract. *Precision Dynamics Corp. v. American Hospital Supply Corp.*, 241 F.Supp. 436 (S.D.Cal.1965). As such, it warranted Amica's cancellation of the Agreement. It is well established that failure of consideration discharges the performance obligations of the damaged party. Corbin on Contracts § 1253 (1964). It would be unjust and unlawful to force Amica to perform its part of the bargain for nothing. With failed consideration on the part of BBS, and the discharge of Amica's performance obligations, the Agreement was at an end. When Amica recognized this, it properly cancelled the Agreement formally.

### Title to the Product

51. A sale consists of the passing of title from the seller to the buyer for a price. West's Ann.Cal.Comm.Code § 2106. The title passes in any manner and on any conditions agreed to between the parties. West's Ann.Cal.Comm.Code § 2401(1).

52. Unless otherwise agreed, title to goods passes when the seller completes performance of physical delivery. West's Ann.Cal.Comm. § 2401(2). An unconditional contract to sell specific existing goods may, if the parties so intend, pass title at time of contract prior to actual delivery. *Schuch v. Northrup–Jones, Inc.*, 162 Cal. App.2d 279, 328 P.2d 279 (2nd Dist.1958).

53. However, title cannot pass prior to identification of the goods to the contract. West's Ann.Cal.Comm.Code § 2401(1). Since future program modifications were to be performed by Amica, the Agreement dealt with future goods. When future goods must be created, title does not pass until those goods are finished and shipped to the buyer. West's Ann.Cal. Comm.Code §§ 2105(2) and 2401(3)(b). Where a sales contract contemplates further work on the goods prior to delivery, no title passes until delivery. *Walti v. Gaba*, 160 Cal. 324, 116 P. 963 (1911); *Seeley v. Cook*, 98 Cal.App.2d 276, 219 P.2d 859 (1950); *Breitengross v. Theodore Krumm, Inc.*, 35 Cal.App.2d 639, 96 P.2d 370 (1939).

54. Claimant argues the case of *Systems Design & Management Information, Inc. v. Kansas City Post Office Employees' Credit Union*, 14 Kan.App.2d 266, 788 P.2d 878 (1990). There, a seller had agreed to sell and install certain software for a credit union. The court stated that:

> ... we conclude the software was movable at the time of identification to the contract, satisfying that requirement of the definition of goods. [Seller] installed the ... software on Credit Union's computer and was present to attempt modifications and corrections of the program so the accounting system would run more efficiently. There services are incidental to the sale of the software because, without Credit Union buying the ... pro-

gram, the services would not be necessary. Therefore, the sale of the software is predominant.

Claimant argues here that sale of the existing PCH programs was "the predominant item of the contract and the modifications were incidental to the sale." However, the argument disregards key terms of the Agreement, including parts that indicate a transfer of rights completed after the modifications were created and paid for and transfer documents executed. (See Finding No. 39.) Here the modifications were not "incidental to the sale," but were integral to it. Terms of the Agreement discussed hereinabove make that clear, as does BBS's repeated articulated refusal to accept the modifications, and its refusal to account for royalties on whatever sales it made.

The Claimant also cites *RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543 (9th Cir.1985) and *Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384 (Col. Sup.Ct.1983), to support its argument. In *RRX Industries*, the 9th Circuit upheld a trial court's finding that the training, repair, and upgrade services were incidental to the sale of the software in order to hold that Article 2 of the UCC applied. Likewise, in *Colorado Carpet Installation*, a Colorado Appellate Court found the installation of carpeting to be incidental to the sale of the carpet. The software program in *RRX* and the carpeting in *Colorado Carpet* already existed in fully developed form at the time of the sale, and the services were performed merely for installation and maintenance. Those courts reasonably concluded that the installation services were incidental to the sale of an already existing good. The parties in this case were not selling an item which already existed, but an item which would only come into existence through the efforts of Amica's programmers. The services performed in order to develop the good to be sold were integral to the sale of the good itself. In other words, Amica's service in developing the PCH software was fundamentally different from the *RRX* defendant's services in maintaining its program or the carpet seller's services in installing

carpet and went beyond the level of mere incidental services.

55. Even where title passes upon sale, should buyer reject the goods, title reverts to seller by operation of law. West's Ann.Cal.Comm.Code Section 2401(4); *In re Pacific Express, Inc.*, 780 F.2d 1482 (9th Cir.1986). Accord: *Joseph T. Ryerson & Sons, Inc. v. Commodity Engineering Co.*, 689 F.2d 478 (4th Cir. 1982); *In re DiNicola*, 92 B.R. 267 (Bankr. S.D.Ohio 1988).

56. Where a buyer has defaulted in complying with vital terms of an agreement, the seller has the choice and option to treat the contract as involving a conditional sale and retake possession of the property, or to ratify the contract as one involving an absolute sale of the property and sue for the recovery of all the monies then payable thereunder. *Johnson v. Kaeser*, 196 Cal. 686, 694, 239 P. 324 (1925); *B.K.K. Co. v. Schultz*, 7 Cal.App.3d 786, 793, 86 Cal.Rptr. 760 (2nd Dist.1970). By reason of the foregoing, even if this Court's view of the Agreement (Finding No. 39) was incorrect and title or rights to the PCH software and modifications passed upon signing of the Agreement, then such title and rights reverted to Amica by virtue of the default by BBS in complying with its essential obligations under the Agreement.

### Rescission

57. A contract is extinguished by rescission. West's Ann.Cal.Civil Code § 1688. A contract may be rescinded for fraud. West's Ann.Cal.Civil Code § 1689. A contract may also be rescinded for failure of consideration. *Id.*

58. In order to rescind a contract, a party need not return the consideration which it has received if the other party refuses to return the consideration which it received. West's Ann.Cal.Civil Code § 1691(b). In the instant case, Amica was not obliged to return the $5,000 it received in the face of failure by BBS to account for royalties due from its sales of PCH.

59. Rescission may be effected by way of defense to a claim on the contract.

West's Ann.Cal.Civil Code § 1692. Therefore, even if Amica had not earlier cancelled the Agreement it could do so now.

■ 60. Where the Court finds that a contract has not been rescinded, it may adjust the equities between the parties, award damages, and/or order restitution of benefits where the circumstances warrant such relief. West's Ann.Cal.Civil Code § 1692. Therefore, even if no rescission or cancellation had taken place here, in the absence of any present tender by claimant of moneys due from BBS, and in the absence of present major marketing capabilities and financial strength, this Court can and should order restitution of any rights and benefits deemed obtained by BBS under the Agreement because of the clear default by it of its obligations.

*Mr. Schupper's Testimony to be Stricken*

61. The creditor B & M and Debtor jointly moved at the close of trial to strike the testimony of Sanford B. Schupper for his refusal to allow full cross examination and failure to return to court to allow such. Apart from examining Debtor's President, claimant called only one witness—Mr. Schupper. Full cross examination of that witness was critical. That witness's absence from full cross examination was not due to death or illness, but was due to his voluntarily leaving the court prior to completing his testimony. The witness and claimant were fully warned by the Court, before Mr. Schupper walked out of the courtroom against the court's instructions, that his failure to return would result in his testimony being stricken. The matters left for cross examination by the objecting creditor were critical to defense of the claim.

■ 62. Cross-examination of a witness is a matter of "fundamental right," the purpose of which is to obtain the truth. *People v. Doll,* 126 Ill.App.3d 495, 81 Ill. Dec. 635, 467 N.E.2d 335 (1984); *People v. Green,* 118 Ill.App.3d 227, 73 Ill.Dec. 695, 454 N.E.2d 792 (1983); *Marut v. Costello,* 34 Ill.2d 125, 214 N.E.2d 768 (1965). Arriving at truth is the fundamental goal of our legal system, *United States v. Havens,* 446

U.S. 620, 626, 100 S.Ct. 1912, 1915, 64 L.Ed.2d 559 (1980), and cross-examination is the indispensable tool in the search for truth. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). *See also United States v. Caudle,* 606 F.2d 451, 457 (4th Cir.1979). Striking the direct testimony of the witness is an appropriate remedy when inability to cross-examine frustrates the purpose of the process. *United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983). Where the witness refuses to submit to cross-examination, the opportunity to probe and test his statements has substantially been lost, and his direct testimony should be stricken. Wigmore, *Evidence,* Section 1391 (collecting cases).

63. If Sanford Schupper had been only one of several witnesses offered by claimant in support of its claim and had knowledge of the facts overlapping with other witnesses, then his testimony might have been deemed duplicative and perhaps cross-examination would not have been critical. However, in this case, Mr. Schupper was proffered as claimant's sole witness with knowledge of all of the facts. He was the only witness on claimant's behalf (other than Debtor's President) with knowledge of negotiation and execution of the Agreement, and events subsequent thereto. Therefore, the inability to complete cross-examination of this witness directly and fundamentally impeded the opportunity of the creditor B & M and Debtor for a fair trial.

64. Based upon this Court's ruling upon commencement of trial that Debtor's counsel and B & M's counsel were each entitled to conduct separate cross-examinations of Mr. Schupper, those counsel planned their cross-examinations on the basis that each would not substantially overlap with the other. While it is true that Debtor's counsel completed his cross-examination of the witness, B & M's counsel had barely begun when Mr. Schupper insisted on leaving the witness stand and refused to proceed with further cross-examination. Mr. Schupper failed to return when he promised.

65. Attached as Exhibit B hereto is a list of the areas which Debtor and the

creditor were unable to explore fully in cross-examination. Counsel for Debtor and the creditor divided their areas of cross examination, so denial of full cross to the creditor B & M denied it as well to Debtor. Even if Debtor had adequate opportunity for cross-examination, B & M had a separate right to cross-examination as a party in interest. The partial examination conducted by Debtor's attorney did not suffice in these circumstances to supply an adequate opportunity to cross examine Mr. Schupper.

66. Wigmore's treatise on evidence and authorities addressing this problem have recognized that if absence of a witness is due to death or illness, the trial judge has discretion whether or not to exclude all or part of the testimony, especially if the testimony is not material. Wigmore, *Evidence*, Section 1390 (collecting cases).

However, when the witness' absence was not caused by death or illness and would not have occurred except for the voluntary act of the witness himself requesting a postponement or other interruption, the direct testimony should ordinarily be stricken. Wigmore, *Evidence*, Section 1390; *Kemble v. Lyons*, 184 Iowa 804, 169 N.W. 117 (1918); *Sperry v. Moore's Estate*, 42 Mich. 353, 361, 4 N.W. 13, 19 (1880).

In analogous situations where witnesses have offered direct testimony but then asserted the Fifth Amendment and refused to answer questions on cross-examination, courts have generally treated this as loss of the fundamental right of cross-examination, and the direct testimony has been stricken. *United States v. Panza*, 612 F.2d 432 (9th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980); *United States v. Lyons*, 703 F.2d 815 (5th Cir.1983); *Wisconsin v. Wedgeworth*, 100 Wis.2d 514, 302 N.W.2d 810 (1981).

67. If the witness is warned that failure to submit to cross-examination will result in striking of the direct testimony, as was done here, then that sanction is particularly warranted. *United States v. Panza*, 612 F.2d 432 (9th Cir.1980).

68. If the testimony introduced on direct examination of the witness is immaterial, duplicative or irrelevant, then it may be that cross-examination is likewise immaterial, duplicative or irrelevant. In this case, however, Mr. Schupper was a critical witness with direct personal knowledge of circumstances key to resolution of this case. As shown in Exhibit B hereto, it was critical to defense against the claim that B & M and Debtor have full opportunity to cross-examine Mr. Schupper regarding his knowledge. Since that was not possible, all of his testimony will be stricken.

69. In post trial brief, claimant presents a revisionist view of facts surrounding the Schupper testimony. It suggests that it was rushed to trial unfairly on a claim filed by it over a year before trial; that the Court was unreasonable in actually closing the trial on the day the Court previously announced would be the last day of trial; that claimant could have presented rebuttal evidence from Mr. Schupper on the very next day; that had trial begun one day before it did, Mr. Schupper's need to return home would not have arisen; that his need to move to a new home was compounded by an unreasonable moving company as well as an unreasonable trial judge; and that his inability to return to court on time was compounded (not surprisingly) by his vain attempt on the last trial day to drive a house trailer from Los Gatos, California (near San Jose) to Colorado Springs, Colorado, in time for a morning flight on the last trial day. Claimant thus has an inexhaustible list of reasons why that witness could not return on the last set trial day and should not have been held to that date.

Most of these reasons were, of course, in Mr. Schupper's or the claimant's control. Instead of putting on Mr. Watkins as a witness first, claimant could have put on Mr. Schupper first so as to complete his testimony before the time Schupper planned his return to California to move his home. Mr. Schupper could have taken a later flight on the day he walked off the stand. He could have parked his trailer in California and flown back from California instead of making a bizarre attempt to

drive the house trailer across difficult roads so as to get a flight from Colorado. Finally, it must be noted that from the last day of trial to the present, there was no attempt by claimant to move to reopen the proof on any grounds by proffering Mr. Schupper for cross or other testimony—thus casting considerable doubt on whether he *ever* returned to Illinois.

70. A federal judge is the governor of each trial before him, responsible to supervise it to completion in reasonable time and through efficient use of time and resources of the court and parties. The Seventh Circuit has repeatedly noted,

> A judge acts not as a mere moderator, but as the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. *Quercia v. United States*, 289 U.S. 466, 469 [53 S.Ct. 698, 699, 77 L.Ed. 1321] (1933). The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities inherent in the adversary process. *Geders v. United States*, 425 U.S. 80, 87 [96 S.Ct. 1330, 1334, 47 L.Ed.2d 592] (1976).

*Doe ex rel. Doe v. St. Joseph's Hospital*, 788 F.2d 411, 415 (1986), quoting *Caruth v. Pinkney*, 683 F.2d 1044, 1051 (7th Cir. 1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983). While personal needs of the parties and counsel should be accommodated where possible, there are times that the parties and witnesses must accommodate to the needs of the Court. The Bankruptcy Judges in this District, with each carrying a case load of about 3,500 bankruptcy cases that generate thousands of disputes, are able to bring matters to trial and resolution on a current basis because set trial schedules are meaningful. Those schedules cannot be adjusted at the whim of a headstrong witness who feels that the Court and parties must accommodate to him instead of the other way around.

## CONCLUSION

In summary, the Debtor prevails on all counts of the claim. Mr. Schupper fraudulently induced Amica to enter into the Agreement by intentionally misrepresenting his company's ability to fulfill its promise of effectively marketing the PCH software in the competitive, national marketplace. BBS further breached the Agreement and its warranty by failing to make the required payments or to market the software as promised. The evidence further demonstrated bad faith and a failure of consideration on the part of BBS.

Amica properly exercised its right under California law to rescind and cancel the Agreement. Under the Agreement, title to the PCH software was to remain with Amica until it was developed. Since the Agreement was rescinded and cancelled before that time, title to the software remained with Amica. Even if one considers the transfer as occurring when the Agreement was executed, title reverted back to Amica by virtue of its lawful cancellation and rescission of the Agreement.

Therefore, even if Mr. Schupper's testimony were not stricken, the claim fails. However, it is important that this Court recognize the necessity of striking his testimony under the unusual circumstances here. In this or any court where each judge carries a heavy load of cases, reasonable cooperation with orderly trial requirements must be expected from parties, counsel, and witnesses. It must be clear that games such as that played by this witness must have a penalty. Therefore for reasons previously stated his testimony must be stricken although that is not necessary to the judgment.

Orders in conformity with the foregoing are entered separately this day.

## EXHIBIT A

## BROWN BAG SOFTWARE

### SOFTWARE PURCHASE AND SALE AGREEMENT

This Software Purchase and Sale Agreement (the "Agreement") is made on this 22nd day of June 1989, by and between Brown Bag Software, Inc., a California Corporation, 2155 South Bascom Avenue, Suite 114, Campbell, CA 95008 ("BB"), and

Amica, a Nevada Corporation, ("Seller"), who's address is 1800 Busse Road, Des Plaines, IL 60016.

WHEREAS, BB is in the business of developing and marketing computer programs and Seller has created the original computer programs described in Schedule A hereto (the "Product") which Seller desires to sell to BB;

### 1. Transfer of Rights

Except as provided for in Paragraph 3, Seller irrevocably transfers to BB all its rights, title and interest in and to the Program and its documentation, including copyright in the programs and the documentation with respect thereto, and all trademarks. Seller agrees to execute any and all assignments and other documents necessary or appropriate to effect or record the transfer of Seller's copyrights and other rights in the Product to BB on an exclusive basis, and shall not be subject to termination or revocation under any circumstances, except as provided in Section 203 of the Copyright Act of 1976, as amended from time to time.

BB, at it's election, may register the copyright in it's own name.

Seller will furnish the program user documentation, as specified for Version 2.0 in Schedule A(i), on diskette form to BB within 14 days from date hereon.

Seller will furnish BB with the full version of the Program Source Code for Product on the delivery of the executable version as specified in Schedule A(i), [Version 2.0] within 14 days from date hereon.

Seller agrees not to develop any other program that performs comparable, similar and/or competitive file transfer functions as does the Product.

### 2. Correction of Errors/Software Modifications

Seller shall correct bugs and errors in the Programs, without compensation other than that provided for in Section 3, for six months after Seller has delivered the Programs to BB. "Bugs" will be defined as features that do not perform as per the program documentation, or features that do not work reliably. Seller will assume no further responsibility for "bug fixes" to the programs, once BB has modified same. Seller will provide the program to BB as compatible with the IBM–PC, XT, AT and IBM Personal System/2 Computers. Seller agrees to modify the Programs as per Schedule A(i). The modifications shall be done in two phases as set forth in Schedule Ai. The first phase shall begin upon execution of this Agreement and shall be included in the Source Code delivered as set forth in Section 1 of this agreement.

The modification for Phase Two as set forth in Schedule A(i) shall commence upon completion of Phase One.

BB Shall make payment for modifications of Phase One upon delivery of Source Code to BB. BB Shall make payment for Phase Two modifications as follows: Fifty Percent of the estimated amount shall be due when Seller begins modifications. BB Shall pay the balance of the modification cost within 14 days after BB's receipt of the changes as set forth in Schedule A(i).

### 3. Royalties

Within fourteen days after their receipt of the Purchased Program suitable for shipment, BB will advance Seller the sum of $5000. No further royalties will be paid to Seller until the $5000 is consumed as "Earned Royalty". BB will pay Seller a 10% royalty on sales of Product sold and collected. All royalties due will be paid within 15 days after the end of the month in which the applicable cash payments were received by BB. Each royalty payment shall be accompanied by a report of the number of copies of each Programs sold during the month and the calculation of the royalties. Payments will be made by an BB check to Seller. If BB fails to pay any royalties due within such fifteen day period, BB shall pay Seller interest on the original balance due at the rate of twelve percent per year. BB shall pay the amounts due and payable within ten days after notification from Seller that any payment is overdue.

BB agrees to pay a minimum accrued royalty of Twenty Five Thousand Dollars, computed as above, during the thirty six month period beginning on the day that BB first ships it's version of the Product to BB's customer(s). If BB fails to pay a minimum total royalty of Twenty Five Thousand Dollars to Seller by the last day of the thirty sixth month, then Title to the Program will revert to Amica. Amica and BB shall then have the right to market the Product Independently. In this event, the loss of exclusivity by BB is Amica's sole remedy.

BB shall maintain its books and records so as to establish the payments due Seller under this Agreement. Such books and records shall be made available at their place of keeping for inspection on a confidential basis during normal business hours by Seller or its accountant solely for the purpose of verifying the payments due to Seller.

### 4. Warranties, Representations and Indemnification

Seller hereby represents and warrants to BB that to the best of its knowledge each Program and its documentation does not and will not violate or infringe any copyrights, trade secrets or other proprietary rights owned by any third parties. Seller further represents and warrants to BB that to the best of its knowledge no other person, company or corporation has any interest in or right to claim (pursuant to any license or otherwise) to any of the Programs, documentation or any part thereof.

Seller and BB warrant to each other that they have obtained all of the necessary approvals and resolutions, as may be required in order to execute this transaction.

Seller shall defend and indemnify BB, its officers, agents, attorneys and employees against and hold them harmless from any and all claims, damages, losses and expenses (including all costs, fees of attorneys, accountants and expert witnesses) arising out of or resulting from any action by a third party against BB, its officers, agents, attorneys and/or employees that arise out of Seller's breach of the representation and warranties contained in Paragraph 4 or is based on any claim that a program or its documentation infringe a patent, copyright or trademark or violate a trade secret or other proprietary right of any person or entity.

The parties shall indemnify each other, its officers, agents, attorneys and employees against and hold harmless from any and all claims, demands, causes of action, and damages, including reasonable attorneys fees and expenses, arising out of the other party's breach of the representations and warranties contained in paragraph 4.

BB will have the right to offset any monies due Seller pursuant to this indemnification.

BB will use best efforts to aggressively market and promote Purchased Products.

### 5. Ownership Disputes

In the event any lawsuit or arbitration proceeding is brought against BB, it's agents or assigns, based upon any ownership dispute, royalties with respect to such program shall be computed but shall not be paid pending final resolution of the dispute. Any amounts BB pays or paid in resolving such disputes (whether fixed or determined by future events or both), including all legal fees and expenses incurred in connection therewith, shall be deducted from the revenues received from all of the Programs for the purposes of computing royalties under Section 3. In the event it is determined that Seller or BB is not the owner of a Program no royalties shall be paid with respect to such Program.

BB will notify Seller in writing of such claim. Seller agrees that it will either defend the suit or arbitration proceeding at its expense and pay all damages and costs awarded against BB or procure for BB the right to continue using the program on an exclusive basis or replace or modify the program so that infringement will not exist. Seller shall not be liable for any claim of infringement based upon the use of the Program in combination with software not supplied by Seller or resulting from modifications to any Program made by BB.

## 6. Confidentiality

Seller and BB agree to maintain the secrecy and information mutually disclosed. Such confidential information and trade secrets shall include, but not be limited to, source code for any computer programs, programming techniques, marketing plans, financial information and projections, and personnel information. This obligation of confidentiality does not apply to information, other than source codes, which (a) Seller can prove by written records that Seller possessed prior to BB's disclosure to him; (b) which is generally known to the public, through no fault of Seller's; or (c) Seller obtained lawfully from a third party, provided Seller did not believe or have reason to believe that the information came directly or indirectly from BB.

## 7. General

This Agreement supersedes any and all other agreements, oral or written, between the parties with respect to the Programs. No waiver by either party of any default in the strict and literal performance of or compliance with any condition of this Agreement shall be deemed to be a waiver of strict and literal performance of or compliance with any other provision in the Agreement nor to be a waiver of strict compliance with any provision in the future.

BB Grants back to seller at no charge, a limited, non-transferable license for the sole purpose of seller performing under the terms and conditions of the SOFTWARE LICENSE AGREEMENT BETWEEN AMICA AND INTELLICOM ("the INTELLICOM AGREEMENT") entered into on _____, 1989, a copy of which is attached hereto as Exhibit ___. BB grants such a limited license for the minimum term of the INTELLICOM AGREEMENT, not to exceed the term of the original Agreement with Intellicom as attached hereto, as specified in Paragraph 4 of the INTELLICOM AGREEMENT. Seller agrees promptly to provide Intellicom the notice required by such Paragraph 4 so that the term of the INTELLICOM AGREEMENT shall not be renewed automatically. The relationship between Seller and BB shall be that of independent contractor, and Seller solely shall be responsible and liable for the performance under the INTELLICOM AGREEMENT. Seller may not assign the INTELLICOM AGREEMENT without the prior written consent of BB.

Seller has identified Samsung as a probable deal in the making for Seller. BB agreed that Seller may continue its sales efforts with Samsung, even after execution of this Agreement. All terms of such a proposed Agreement are subject to approval by BB. The actual Agreement with Samsung will between BB and Samsung and all funds received by BB from such an Agreement will be passed onto Seller, less BB's actual cost of goods and handling/shipping, if any. Seller specifically warrants that it is negotiating a nonexclusive, nontransferable "bundling license" with Samsung.

Seller has arranged and paid for participation in three trade shows as set forth below:

SHOW

| | Location | Size | Date | Cost |
|---|---|---|---|---|
| ComputerLand | Chicago | 10' | 7/21 | $2,475 |
| PC–Expo | Chicago | 20' | 10/03 | $3,750 |
| Comdex (Fall) | Las Vegas | 15' | 11/13 | $4,950 |

BB will assume responsibility and cost of these trade shows. BB shall reimburse Seller for the payments that have already been made. Such reimbursement shall occur 30 days prior to the scheduled date of the shows.

Seller may purchase finished Product, at BB's cost, for the purpose of Selling an

**560**

End–User Version of the Product to Seller's own customers in the Insurance Industry and specifically bundled with Seller's product(s) for the Insurance Industry. Seller may not sell or license Product acquired from BB in this manner to any reseller, VAR, distributor or OEM.

On execution of this Agreement, Seller will deliver the all of the names of known customers and dealers for the Product to BB, for the exclusive use of BB.

Seller will refer all orders and inquiries to BB in a timely manner and will not retain the names of such referrals in it's records. All telephone inquiries will be told that "Brown Bag Software has acquired all rights to the Product. You may contact them at 800 523 0764 or in California 408 559 4545". All orders and sales inquiries received in the mail will be immediately mailed by first class mail to BB at: 2155 South Bascom Avenue, Suite 114, Campbell, CA 95008, Attention: Order Entry, or such other address that BB may advise Seller of, in writing via Certified mail to the address of seller shown below.

If any portion of this Agreement is deemed to be invalid or unenforceable, this Agreement shall be considered as if such portion had never been part of it.

Seller will sell BB all finished goods and raw material currently on hand with Seller at Seller's actual cost, FOB Des Plaines IL on "Net 30 Day Terms". A copy of the invoice for such finished goods is attached as SCHEDULE B herewith.

Seller will supply BB with the complete Bill of Material for the Purchased Programs, including wiring diagrams for cables, and a list of all suppliers and prices for components therein, attached as SCHEDULE C herewith.

Seller will attach all copies of current distribution agreements, if any, that it has executed for distribution of the Purchased Programs as SCHEDULE D herewith.

This Agreement may not be changed or modified except by a written agreement signed by both parties. Any notice hereunder shall be deemed to have been received seventy-two (72) hours after it has been deposited in the mail, proper postage prepaid and registered, addressed to the party for whom it is intended at the following addresses:

If for Amica, to:
Amica
Contract Administrator
1800 Busse Highway
Des Plaines, IL 60616–1627

If for Brown Bag Software, Inc. to:
Brown Bag Software Inc.
Contract Administrator
2155 South Bascom Avenue # 114
Campbell, CA USA 95008

Each party is acting as an independent contractor and not as an agent, partner, or joint venture with the other party for any purpose. Except as provided in this Agreement, neither party shall have any right, power or authority to act or to create any obligation, express or implied, on behalf of the other.

This Agreement will be interpreted in accordance with the laws of the State of California. The Parties have executed this Agreement as of the date written above at Campbell, California.

The parties have read this Agreement and agree to be bound by its terms and further agree that it constitutes the complete and exclusive statement of the Agreement between them which supercedes all prior proposals, oral or written, and all other communications between them relating to the Purchase and Sale of the Product.

BROWN BAG SOFTWARE, INC.

/s/ By: Sandy Schupper
Sandy Schupper, Chairman

Amica

/s/ By: Barry Watkins

President
Printed name and title

June 22nd, 1989

## SCHEDULE A

The computer programs contained in a product currently marketed as PC–Hooker and/or Rapid Transit and all derivatives and antecedents thereof.

### Schedule A(i)

I. Licensor agrees to provide BB with the Program modifications described below under the following terms and conditions:

A. The modifications will be considered an integral part of the Program and are covered by all of the terms and conditions of this Agreement.

B. Modifications Listed herein will be done at BB's expense, pursuant to the terms and conditions of Section 2 of this Agreement.

C. Seller may make additional modifications as requested by BB. Modifications requested by BB that are in addition to those listed herein will be done at BB's expense. Such modifications will be requested in writing and added to this Schedule A(i).

II. Phase I (PC–HookUP Version 2) [Note Name Change]

A. ESC take you back one step and eventually to exit to DOS.

B. All text in an external file.

C. Context Sensitive Help, including error messages.

D. Change Copyright notice to "Copyright 1989 Brown Bag Software Inc, Campbell, CA USA, All Rights Reserved Worldwide". This should be on opening screen, inside code randomly and on main working screen.

E. Serialization Provision

1) Hard-code 8200XXXXXX into two places within main program. Serial number will appear on main working screen, with user name and copyright notice as per main screen (top) of PowerMenu.

F. End User Name on Startup and Main Screen

1) Install provision (required) that asks user for his name (as does PowerMenu) and inserts that name within code and displays name in startup and main screen as "Licensed to: John Doe", as per Power Menu

2) User name, serial number and copyright must be encrypted within code and tamper resistant. (as per PowerMenu)

I. Phase II (PC–HookUP Version 3)

A. Move directory within a drive (Prune & Graft)

B. Mouse Support

C. Prompt for directory when not the same on host and remote. Automatically center directory on remote.

D. Remote install.

E. Speed competitive with Laplink 3.

## EXHIBIT B

*Outline of Cross–Examination of Sanford B. Schupper*

I. Contract.

A. Contract interpretation.

Circumstances of formation of contract, meaning and intention of the parties of certain terms used:

1. "irrevocably" (par. 1)

2. "sole remedy" (par. 3)

3. "Except as provided in Paragraph 3 ..." (par. 1)

4. "best efforts" warranty (par. 4)

5. "delivery" of source code (par. 1)

6. "suitable for shipment" (par. 3)

B. Title never passed.

At the time of execution of the contract, the computer software program that BB was contracting to purchase was not in existence and the contract required Amica to create the computer software program after contracting. (future goods)

C. Reversion of title to Amica.

1. BB consistently rejected the computer software program as having "bugs" and as not conforming to specifications of the contract.

2. Amica offered on several occasions to return the $5,000 and rescind the contract, but BB consistently refused.

D. Conditions precedent.

1. Payment of $5,000 royalty payment was a condition precedent to transfer of title.

2. BB's payment of $5,000 was for "Technical Documentation" (user manual), not for royalty. (Schupper also testified that he never paid $5,000 advance royalty payment because he never received a final version "suitable for shipment.")

3. Payment for all of modifications for Phase One and one-half of payment for Phase Two was due simultaneously (concurrently) with delivery of source code.

4. Execution of copyright assignment was a condition precedent to transfer of title.

E. Breach.

1. BB failed to pay advance royalty, modification fees and trade show fees when they were due.

2. BB admitted to me (T. Johnson) and to Barry Watkins that it couldn't pay and didn't know when it could pay.

3. Amica offered that both BB and Amica market "PC Hooker" as an interim solution, but BB refused.

4. BB asked to have the contract modified to excuse its obligation of payment, but Amica declined.

II. Fraudulent Inducement.

A. Prior to the bankruptcy of BB, Sanford Schupper was principal owner of a company called Software Resource Group, which filed for bankruptcy then reorganized into Telemarketing Resources. Telemarketing Resources later changed its name to BB.

B. Gronack loaned BB $500,000 and invested an additional $500,000 in July, 1988.

C. BB defaulted on the loan to Gronack in December, 1988.

D. Gronack heavily pressed BB for payment in Spring, 1989.

E. BB was also involved in a lawsuit with Symantech at this time and was incurring heavy legal fees.

F. BB was unprofitable every month of 1989.

G. BB was desperately looking for new assets in June, 1989 when it offered to buy Amica's software product ("PC Hooker") and was willing to promise anything to get it without regard to whether it was capable of performing.

H. BB filed bankruptcy in December, 1989.

I. BB had a $2.5 million negative net worth, and had 19 lawsuits pending against it, including 6 judgments.

J. BB's bankruptcy schedules list its assets as software valued at $1,500,000. This was a gross overvaluation with the true value between $200,000–$350,000 (as shown by one contemporaneous offer to purchase and one appraisal).

K. BB's bankruptcy schedules listed a claim against Symantech for $2,000,000 as an important asset (out of total of its $4.5 million in assets), but BB lost its lawsuit against Symantech in September, 1989 by summary judgment.

L. All of the liabilities of BB listed in its schedules in December, 1989 were liabilities of BB in June, 1989 when it entered into the agreement with Amica.

M. BB did not disclose to Amica and concealed its true financial condition in June, 1989.

N. BB was totally incapable of performing the marketing which it promised to Amica to induce Amica to enter into the agreement.

O. BB's warranty to use "best efforts" was totally misleading and omitted to state material fact in light of the then existing financial condition of BB.

P. Sanford Schupper had engaged in a pattern of purchasing software products from various companies and then refusing to pay—Quicksoft, Stella Systems, PC Outline.

III. Damages.

A. *Software Resources.*
BB was selling 6 other products before and at the same time as selling "PC Hooker."

BB's sole distributor for all of its products was Software Resources.

Software Resources purchased only $300–$400 per month of "PC Hooker" from BB before Amica's attorney (T. Johnson) contacted Software Resources and questioned their right to sell "PC Hooker."

Software Resources refused to sign Mr. Johnson's request that they discontinue marketing "PC Hooker" supplied by BB.

Software Resources and BB have continuously marketed "PC Hooker" and do so today (no lost sales).

B.  *DAK*

BB had never sold any products to DAK.

Amica had sold products to DAK on several occasions.

Amica's agreement to sell $84,000 worth of products to DAK was concluded in January, 1989—3 months after the agreement between Amica and BB was cancelled.

There were no contacts between Amica and DAK on this sale until several weeks after cancellation of the contract.

BB tried to enjoin the sale to DAK by Amica in March, 1990 before the federal court in California but was unsuccessful.

BB's attorney admitted in writing that BB "had no legal basis" to object to Amica's sale to DAK.

BB didn't register the "PC Hooker" copyright until May, 1990.

There is no showing that DAK would have purchased from BB even if BB owned "PC Hooker." (DAK said they would not purchase from BB because BB was in bankruptcy.)

Amica's sale to DAK was not all profit. BB's own sales of "PC Hooker" gave them about 5% profit.

C.  *Other Sales.*

BB was supposed to have received "PC Hooker" from Amica on September 1, 1989.

BB began marketing "PC Hooker" in January, 1990.

What sales did BB lose in this four-month period?

No written evidence submitted in this trial of pending negotiations or sales to Compaq.

No written evidence submitted in this trial of pending magazine promotion.

No written evidence submitted in this trial of pending negotiations or sales to federal government.

D.  *Set-off.*

1.  BB owes Amica approximately $41,000.

2.  BB has sold "PC Hooker" alone and as part of another computer program ("Power Menu Plus") but has not accounted to Amica for royalties.

E.  *Causation.*

Any damages BB suffered were caused by:

1.  BB's default on its loan to Gronack.

2.  BB's loss on the Symantech lawsuit and demand for $350,000 in legal fees owed by BB.

3.  BB's payment of $40,000 to Interface Group at the same time it was supposed to pay Amica.

4.  Closure of its U.K. office.

5.  The California earthquake.

6.  BB's filing of bankruptcy.

—but *not* by Amica's failure to deliver "PC Hooker," since BB went ahead and marketed "PC Hooker" anyway without Amica's consent.